STATE of Wisconsin, Plaintiff-Appellant,†

v.

POLY-AMERICA, INC., a Texas corporation,
Defendant-Respondent.

Court of Appeals

*No. 91-0011. Submitted on briefs July 23, 1991.—Decided
August 13, 1991.*

(Also reported in 474 N.W.2d 770.)

†Petition to review denied.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *James E. Doyle,* attorney general, and *Bruce A. Craig,* assistant attorney general, and on the oral argument of *Bruce A. Craig,* assistant attorney general.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Matthew J. Flynn* and *Michael G. Carter,* and on the oral argument of *Matthew J. Flynn* of *Quarles & Brady* of Milwaukee.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.   The state appeals a dismissal of its action charging Poly-America, Inc., with violations of sec. 98.26(1)(c), Stats.[1] The complaint charged that Poly-America, a manufacturer of polyethylene sheeting

---

[1] Section 98.26(1)(c), Stats., states that a person who does the following engages in a prohibited act: "Represents in any manner

doing business in Wisconsin, sold 181 rolls of product that were underweight when compared to the weight stated on the package label. The parties request that we interpret the terms of Wis. Adm. Code § Ag 53.12(1) to determine whether the charges should have been dismissed. The trial court concluded that a lot may include those packages found on the retail shelf, but dismissed the action on summary judgment because the packages did not constitute a sufficient quantity to amount to a lot as that term is used in the Wisconsin Administrative Code.

We agree with the trial court that the term "lot" as used in § Ag 53.12(1) applies to an "inspection" lot consisting of packages packed at the same place, time and under the same conditions. Also, we conclude that the state must make reasonable efforts to construct a fair inspection lot and because this is a factual issue which cannot be determined at the summary judgment stage, we reverse and remand the matter to the trial court for a trial on this issue. Finally, we conclude that at the time the complaint was filed, the maximum allowable variation (MAV) for polyethylene sheeting was 7%. Because the parties agree that some packages exceeded this weight variation and would therefore constitute an unreasonable weight variation, we reverse the trial court's dismissal of this charge and remand the matter to the trial court for further proceedings.

■■■■

The interpretation of an administrative rule is a question of law that we review de novo. *Beloit Corp. v. LIRC*, 152 Wis. 2d 579, 591, 449 N.W.2d 299, 305 (Ct. App. 1989). We are guided in this task by the same principles that apply to statutory construction. *State v.*

a false quantity in connection with the purchase or sale, or any advertising thereof, of any commodity, thing or service."

*Bucheger*, 149 Wis. 2d 502, 506, 440 N.W.2d 366, 368 (Ct. App. 1989). If an administrative rule is unambiguous, we look to the plain meaning of its terms. *Id.* at 507, 440 N.W.2d at 368. An administrative rule is ambiguous if reasonable persons can understand its terms differently. *Id.*

Wis. Adm. Code § Ag 53.12(1) provides:

> **Variations to be allowed.** (1) Variations from Declared Net Quantity. Except as otherwise provided by statutes or rules thereunder, variations from the declared net weight, measure, or count are permitted only when caused by unavoidable deviations in weighing, measuring, or counting the contents of individual packages that occur in good packaging practice, *but such variations shall not be permitted to such extent that the average of the quantities in the packages of a particular commodity, or a lot of the commodity that is kept, offered, or exposed for sale, or sold, is below the quantity stated. No unreasonable shortage in any package shall be permitted, even though overages in other packages in the same shipment, delivery, or lot compensate for such shortage.* Variations above the declared quantity shall not be unreasonably large. (Emphasis added.)

A "shortweight" violation occurs, then, in two ways: when the average weight of a particular "lot of the commodity that is kept, offered, or exposed for sale, or sold" falls under the labeled weight[2] or an individual package

---

[2]The state charged separate violations for *each package* found in a lot whose average fell below the labeled weight. Poly-America does not argue that the regulation allows only one charge when a lot's average weight fails to meet the standard. Accordingly, we express no opinion on the allowable unit of prosecution under this statute.

has an "unreasonable shortage."[3] We conclude that the term "lot of the commodity that is kept, offered, or exposed for sale, or sold" is ambiguous because reasonable persons could understand it to apply to any quantity of a product on a given retailer's shelf, or only to that quantity that represents a fair sampling of a manufacturer's product and, thus, we resort to extrinsic aids to determine the agency's intent in adopting the rule. *See State ex rel. Staples v. Young,* 142 Wis. 2d 348, 354, 418 N.W.2d 333, 336 (Ct. App. 1987). On the other hand, the term "unreasonable shortage" is not ambiguous because National Bureau of Standards (NBS) regulations exist to aid a court in determining its meaning.[4]

## DEFINITION OF A "LOT"

The language of § Ag 53.12(1) is virtually identical to that used in § 12.1.1 of the model 1978 Uniform Packaging and Labeling Regulation, as adopted by the National Conference on Weights and Measures. NBS Handbook 130, *Uniform Laws and Regulations* at IV-40 (1989). The National Conference is sponsored by the NBS "in partial implementation of its statutory responsibility for 'cooperation with the States in securing uniformity in weights and measures laws and methods of inspection.' " *Id.* at IV-3 n.1. At oral argument, both sides agreed that except for Louisiana, every state,

---

[3]In the alternative, the state charged that the 181 shortweight packages represented "unreasonable" shortages.

[4]*See Harnischfeger Corp. v. Industrial Comm'n,* 263 Wis. 76, 79, 56 N.W.2d 499, 500 (1953) ("When in writing an administrative order or a statute, the framer of the order or statute uses words which have a technical and well-established meaning universally understood in commerce or trade, that meaning must be read into and understood to be descriptive of the particular object dealt with in that order or statute.").

including Wisconsin, has adopted NBS Handbook 133, *Checking the Net Contents of Packaged Goods* (3d ed. Sept. 1988), as its guidelines.

When a state statute is modeled after a federal rule, we look to the federal interpretation of that rule for guidance and assistance. *State v. Shillcutt,* 116 Wis. 2d 227, 232, 341 N.W.2d 716, 718 (Ct. App. 1983), *aff'd,* 119 Wis. 2d 788, 350 N.W.2d 686 (1984). We conclude that NBS handbooks interpreting various portions of the model legislation serve as persuasive authority in defining the terms of our state regulation.

The state contends that "lot," as referenced in § Ag 53.12(1), includes a selection of packages found on the retail shelf. In response, Poly-America argues that the state "cannot pick out as few as ten items remaining on a retail shelf, diminished by sale and distribution, and interpret that group of items as a 'lot.' " NBS Handbook 133 defines a "lot." Because we conclude that NBS handbooks are persuasive authority, and because the definition of this term is quite technical, we quote at length from the handbook:

### 2.3. Definition of the Lot

As a first step in package testing, the official designates the collection of packages upon which action will be taken as a result of the official's tests. This is the "INSPECTION LOT." Based on the factors likely to cause variations in quantity, the official should designate as the inspection lot *the largest possible group of packages,* in accordance with the following guidelines:

(i) The inspection lot must consist only of packages of the same product, with the same label, from the same packer . . ..

246

This rule should <u>never</u> be violated.

(ii) *To the greatest extent possible, the inspection lot should consist only of packages packed at the same place, at the same time, under the same conditions.*

This guideline is in addition to the provisions of guideline (i). Therefore, a lot should consist of packages of the same product and the same label. They should also have the same lot code number if inspection is done at the warehouse, or be packages from the same filling line, packed during the same period, if inspection is done on-line at the packing plant. *It is not absolutely necessary to sort by lot code when testing packages in a retail location; a shipment or delivery may in fact be composed of packages with different lot codes.*

It is not always possible to take the second guideline into account in designating lots. In fact, taking both guidelines into account may lead to a very small inspection lot, the result which is undesirable. *The inspection lot should be as large as possible without violating guideline (i), yet taking into account the factors mentioned in guideline (ii).*

. . ..

## 2.3.1. The Inspection Lot of Standard Pack Packages

"Standard pack" packages are defined as those packaged with identical labels in a few selected quantity sizes. For example, canned ham labeled "5 pounds" is a standard pack meat item. The packager "targets" the amount of product put into the package according to the net contents already selected to be on the package container's label.

The inspection lot must always consist of packages with identical labels (except for the lot code).

247

a. **When the location of test is a retail store:** Because state and local regulations apply to "lots, shipments or deliveries," a shipment or delivery comprised of packages with different lot codes may be acted upon as a single inspection lot. *Follow-up inspection will require segregation of lots by lot code.*

*Id.* at 2–5 to 2–6 (emphasis added).

As the state contends, the federal definition of an inspection lot contemplates inspections at retail sites. We note, however, that the Wisconsin regulation at issue does *not* apply to "lots, shipments, or deliveries" as indicated in NBS Handbook 133 § 2.3.1(a) above, but only to "lots." Additionally, even where retail site inspections are permitted, the guidelines anticipate a follow-up inspection, with segregation of lots by lot code.

Taken as a whole, the federal definition of a "lot" evidences concern that "[t]o the greatest extent possible, the inspection lot should consist of packages packed at the same place, at the same time, under the same conditions." *Id.,* § 2.3.(ii) at 2–5. This concern does not mean, as Poly-America argues, that the state must test an entire 2,000-pound *manufacturing* lot in order to establish a violation of the statute. Section Ag 53.12(1) applies to an "inspection lot," as interpreted by the federal guidelines, and not to a "manufacturing lot." On the other hand, an "inspection lot" may be more than the product remaining on a retailer's shelf after being diminished by sale, distribution or otherwise.

In addition, the federal guidelines suggest, and we conclude, that the term "inspection lot" requires reasonable state efforts to "make the inspection lot as large as possible," while attempting to insure that "[t]o the greatest extent possible, the inspection lot [consists] only of

248

packages packed at the same place, at the same time, under the same conditions." Here, additional state inspections resulted in overweight averages, but the uncoded overweight products were not counted in making the underweight average determination.[5] Also, the underweight "lots" supporting the state's charges represent inspections of Poly-America's product at nine Menard's stores. Five different types of packages were inspected. The state tested only fourteen Type "C" packages,[6] and all fourteen were on the retail shelves of a single Menard's location. Similarly, the state tested only ten Type "D" packages[7] at a single location. While greater numbers of Type "A," "B" and "E"[8] packages were tested at a larger number of locations and not included in the state's inspection lots, there is no indication of the production lot to which these packages belonged.

We agree that the state need not employ unreasonable measures to insure that it constructs a fair inspection

---

[5]The state argues that not all of the products tested as overweight were identical to those that appeared in the complaint as underweight. While this is true, when considering only Types A–D, Poly-America's expert discovered that fourteen underweight sublots were discovered, while eight overweight sublots were ignored. While the state correctly notes that the percentage of underweight lots was 63.64% of the total tested, its argument does not address why the overweight sublots were not considered in the construction of an appropriate "inspection lot."

[6]Type "C" packages were labeled with dimension, thickness and weight of 12 ft. × 100 ft. × .003 (17.2 lbs.).

[7]Type "D" packages were labeled with dimension, thickness and weight of 8 ft. 4 in. × 100 ft. × .006 (23.8 lbs.).

[8]We note, however, that Type "E" packages were inspected at only two of the nine Menard's locations, and only 20 of this type of package (8.33 ft. × 100 ft. × .004 (15.9 lbs.)) were tested.

lot. Obviously, it is not required to go to the manufactur-
ing site to examine the manufacturer's records. What is
reasonable will depend upon the information available to
the state at the time of constructing the inspection lots.
In this case, because Poly-America did not mark its
packages with a lot code, the state argues that it there-
fore could not reasonably determine whether similar·
packages found outside the retail shelf should have been
included in the inspection lot. However, there may have
been other information available to assist the state in
determining whether those packages should have been
included in the inspection lots. Therefore, the absence of
lot codes on the packages is a factor to consider along
with the other information available in arriving at the
ultimate determination of whether the state made a rea-
sonable effort to construct a fair inspection lot. Because
this is a disputed issue of fact, it cannot be resolved by
summary judgment. *See* sec. 802.08(2), Stats.

## WHEN IS A VARIATION IN THE INDIVIDUAL PACKAGE AN "UNREASONABLE SHORTAGE?"

The trial court also dismissed the state's alternative
charge of violations due to "unreasonable shortages" in
181 individual packages. The court recognized that fed-
eral standards had been established setting up maximum
allowable variances (MAVs) for a number of measure-
ments. Because the court determined that the 2% varia-
tion in weight allowed "for an individual package labeled
by weight"[9] did not apply to polyethylene sheeting, it
apparently reasoned that there was no weight MAV for
this product, and therefore ruled that the state had failed
to prove the shortweights here were "unreasonable." On

---

[9]*See* NBS Handbook 133, *supra,* Table 2–8, at B–9 to B–10.

appeal, the parties agree that the standards provide some weight MAV, although they disagree as to the amount of allowable variation. As a result, there appears to be no dispute that at least some of the individual packages found to be underweight by the state represent "unreasonable shortages."[10] We agree and conclude that the charges of shortweight violations relative to those packages exceeding the weight MAV should not have been dismissed.

Admittedly, the NBS standards are difficult to follow as applied to polyethylene sheeting. The state contends that the 2% general MAV applicable to any "individual package labeled by weight" should be used to determine the weight MAV for polyethylene sheeting, while Poly-America argues that a "specific" 10% MAV applies.

We address first the state's contention that the general 2% MAV applies. In a section of the NBS Handbook labeled "Exceptions to the MAV's," the Bureau notes: "When necessitated by packaging practices or the nature of the product, MAV's exceeding those listed in Tables 2-8 through 2-11 must be applied." NBS Handbook 133, *supra,* at 2-26. The state's requested general 2% MAV is found in Table 2-8. *Id.* at B-9 and B-10. However, the first exception listed in the handbook is for polyethylene sheeting and film. *Id.,* § 2.13.1. at 2-26. Therefore, the general 2% MAV for all packages is specifically preempted under the clear language of the standards by specific exceptions listed in the handbook.

---

[10]Poly-America states that it "recognizes the right of the State to impose a fine under Section 98.26(1)(c), Stats. for individual items which have weights <u>unreasonably</u> below the stated weight (as defined in Handbook 133)."

■

We next examine Poly-America's contention that a 10% weight MAV should apply to polyethylene sheeting. Unfortunately, the specific exception section does not provide an MAV for weight. It lists an MAV of 7% when polyethylene sheeting is measured by *thickness*. *Id.* at 2–27. Poly-America argues that manufacturers of polyethylene sheeting are entitled to an additional 3% MAV for variations in area measurements. They cite to Table 2–11, labeled "MAV's for an individual package labeled by length (width) or by area," for this proposition. *Id.* at B–14. For the same reasons that we rejected a general 2% weight measurement, we conclude that the general 3% area MAV is preempted by the specific thickness MAV exception found in § 2.13.1.

■

Poly-America next contends that a 10% weight MAV is supported by standards developed by the American Society for Testing and Materials (ASTM) Standard D–2103–86 at 4.3 and Table 3 (ASTM "Standard Specification for Polyethylene Film and Sheeting," Designation: D 2103–86). In Poly-America's view, NBS adopted the entire ASTM standard by referencing it once in its discussion of MAV exceptions for polyethylene sheeting. NBS Handbook 133, *supra,* at 2–26 n.2. We are not persuaded. The NBS exception section generally referenced the ASTM standard, but specifically provided that "[t]he average thickness of a single package of polyethylene sheeting may be as much as 7% below the labeled thickness (*i.e.,* at least 93% of the labeled thickness)." *Id.* at 2–27. The footnote cited at the end of this specific standard cites an entirely different ASTM standard, Standard D–4397–84. We conclude that there is no support in the NBS standards for a weight MAV of 10% to be applied to polyethylene sheeting.

Both parties recognize that weight and thickness of polyethylene are two closely related dimensions. The NBS handbook provides a formula setting out the relationship between the various dimensions. *Id.,* § 5.4.3. at 5-10.[11]

This relationship between weight and thickness has been recognized by the NBS. The Report of the 74th National Conference on Weights and Measures 1989[12] indicates that the industry as a whole accepts that these two dimensions should be subject to the same MAV. National Conference Report, *supra,* at 97. We conclude that the NBS standards can be construed as implicitly providing for a 7% weight MAV, consistent with the 7% thickness MAV for polyethylene sheeting.

Accordingly, we hold that the charges of shortweight violations relative to those Poly-America

---

[11]The handbook provides that the following formula is to be used to check the label declaration to make sure that all the declared dimensions are consistent with one another:

$$W = T \times A \times D \times 0.03613, \text{ where}$$

W = net weight in pounds

T = nominal thickness in inches

A = nominal area; that is, nominal length in inches times nominal width in inches

D = density in grams per cubic centimeter as determined by ASTM Standard D1505-68 "Standard method of Test for Density of Plastics by the Density Gradient Technique" (or latest issue).

0.03613 is a factor for converting $g/cm^3$ to $lb/in^3$.

[12]Sponsored by the National Institute of Standards and Technology (NIST), formerly the NBS, July 16–21, 1989. Nat. Inst. Stand. Technol. Spec. Publ. 771 (Sept. 1989).

packages that exceeded the 7% weight MAV should not have been dismissed. Also, the issue of whether the state made a reasonable effort to construct a fair inspection lot was not ripe for summary judgment. We remand to the trial court for proceedings consistent with this opinion.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions. No costs are awarded.