# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2018AP319-CR |

COMPLETE TITLE:
State of Wisconsin,
      Plaintiff-Respondent,
   v.
Timothy E. Dobbs,
      Defendant-Appellant-Petitioner.

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 388 Wis. 2d 144,930 N.W.2d 280
(2019 – unpublished)

| | |
|---|---|
| OPINION FILED: | July 3, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 1, 2020 |

SOURCE OF APPEAL:
| | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Dane |
| JUDGE: | Clayton Patrick Kawski & Jill Karofsky |

JUSTICES:
DALLET, J., delivered the majority opinion of the Court with respect to Parts I, II, and III.C., in which all Justices joined; the majority opinion of the Court with respect to Part III.A., in which ROGGENSACK, C.J., ANN WALSH BRADLEY, ZIEGLER, and HAGEDORN, JJ., joined; and the majority opinion of the Court with respect to Part III.B., in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and KELLY, JJ., joined. ZIEGLER, J., filed a concurring opinion, in which ROGGENSACK, C.J., and HAGEDORN, J., joined. KELLY, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Michael D. Rosenberg* and *Community Justice, Inc.*, Madison. There was an oral argument by *Michael D. Rosenberg*.

For the plaintiff-respondent, there was a brief filed by *Michael C. Sanders*, assistant attorney general; with whom on the

brief is *Joshua L. Kaul*, attorney general. There was an oral argument by *Michael C. Sanders*.

An amicus curiae brief was filed on behalf of The Innocence Projects, In., and the Wisconsin Innocence Project by *Andrew T. Dufresne*, *Sopen B. Shah*, and *Perkins Coie LLP*, Madison; with whom on the brief was *Keith A. Findley* and the Wisconsin Innocence Project, Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2018AP319-CR
(L.C. No. 2015CF1938)

STATE OF WISCONSIN      :      IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

      v.

Timothy E. Dobbs,

      Defendant-Appellant-Petitioner.

**FILED**

**JUL 3, 2020**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court with respect to Parts I, II, and III.C., in which all Justices joined; the majority opinion of the Court with respect to Part III.A., in which ROGGENSACK, C.J., ANN WALSH BRADLEY, ZIEGLER, and HAGEDORN, JJ., joined; and the majority opinion of the Court with respect to Part III.B., in which ANN WALSH BRADLEY, REBECCA GRASSL BRADLEY, and KELLY, JJ., joined. ZIEGLER, J., filed a concurring opinion, in which ROGGENSACK, C.J., and HAGEDORN, J., joined. KELLY, J., filed a concurring opinion, in which REBECCA GRASSL BRADLEY, J., joined.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA FRANK DALLET, J. The petitioner, Timothy E. Dobbs, seeks review of the court of appeals' decision[1] affirming his judgment of conviction for homicide by intoxicated use of a vehicle.

---

[1] *State v. Dobbs*, No. 2018AP319-CR, unpublished slip op. (Wis. Ct. App. May 2, 2019).

¶2 Dobbs raises two issues on appeal. First, Dobbs asserts that the circuit court improperly excluded the expert testimony of Dr. Lawrence White.[2] Second, Dobbs claims that the circuit court erred in denying his motion to suppress statements that he made to law enforcement because he was subject to custodial interrogation and not read the Miranda warnings,[3] or, in the alternative, because his statements were not voluntarily made.[4]

¶3 We conclude that the circuit court properly exercised its discretion when it excluded Dr. White's exposition testimony for a lack of fit with the facts of Dobbs's case. Additionally, although we determine that several of Dobbs's statements should have been suppressed because he was subject to custodial interrogation and was not read the Miranda warnings, we conclude that the error was harmless. We further conclude that all of Dobbs's statements were voluntary.

¶4 We therefore affirm the decision of the court of appeals.

I. FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶5 On the morning of September 5, 2015, a vehicle crossed several lanes of traffic and a median area, drove over a curb,

---

[2] The Honorable Clayton P. Kawski of the Dane County Circuit Court presided over the State's motion to exclude the testimony of Dr. Lawrence White.

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

[4] The Honorable David T. Flanagan of the Dane County Circuit Court presided over Dobbs's motion to suppress.

and struck a pedestrian. The vehicle left the scene. Several blocks from the scene, Madison Police Officer Jimmy Milton noticed a vehicle with a completely deflated tire and exposed wheel rim on the front driver's side that matched the witnesses' description of the vehicle involved in the hit and run. Officer Milton positioned his squad car to prevent the driver, later identified as Dobbs, from leaving.

¶6 With his hand on his service weapon, Officer Milton instructed Dobbs to show his hands and exit the vehicle. Dobbs was immediately handcuffed and placed in the squad car. Officer Milton told Dobbs he was "being detained" for an ongoing "accident investigation" and that he was suspected of striking a pedestrian. Shortly after placing Dobbs in the squad car, Officer Milton learned that the pedestrian had died.

¶7 At 7:30 a.m., Officer Milton started questioning Dobbs while he remained handcuffed in the backseat of the locked squad car. The audio from Officer Milton's microphone did not start recording until 7:34 a.m.[5] At 7:34 a.m., Officer Milton asked Dobbs his date of birth and questions about his vehicle's registration. At 7:36 a.m., Officer Milton said to Dobbs "I smell alcohol." Over the course of the next hour, Officer Milton talked to Dobbs about a variety of topics and asked him numerous questions, including:

---

[5] Officer Milton testified that he asked Dobbs his name, address, where he had been coming from, where he was headed, and other "identifying" information during this time.

3

- "Do you have any medical issues other than that splint that you were wearing?"

- "Do you take medications for depression and anxiety?"

- "Do you have any injuries from the collision with the curb?"

- "So [those bruises and scratches on your face] are all old?"

In response to Officer Milton's comments, Dobbs stated that he had not slept in 40 hours and had not taken his medication that morning. Dobbs told Officer Milton that "he was adjusting his arm in the sling, and he lost control of the vehicle and he hit the curb, and that's what caused the damage to his front driver's side tire."

¶8 About 30 minutes into the questioning, Dobbs said "I take it I'm going to jail." Officer Milton never responded to Dobbs's statement, but he made several subsequent comments that there was an ongoing investigation and that was why there were up to three other officers on the scene at a time, including a K-9 unit.

¶9 During the questioning, Officer Milton exited the squad car several times to observe the exterior and interior of Dobbs's vehicle, alongside two other officers. Officer Milton saw "impact damage" to the front end and hood of Dobbs's vehicle, including two dents and a tree branch that was lodged in the vehicle's hood. Officer Milton also observed a can of

4

air duster[6] in plain view in the front center console, which was within reach of the driver's seat.[7] Officer Milton described the vehicle's damage in detail to Dobbs and made comments like "it's obvious you hit something because your wheel is damaged."

¶10 After about an hour, Officer Milton removed Dobbs's handcuffs and he was escorted out of the locked squad car to perform field sobriety tests. Dobbs displayed no signs of intoxication during the tests, but Officer Milton asked him to submit to a blood test. Dobbs agreed and was subsequently transported to a nearby hospital.

¶11 Dobbs arrived at the hospital at approximately 9:08 a.m. Additional officers arrived at the hospital, including Officer Nicholas Pine, who began a drug recognition evaluation at approximately 9:45 a.m.[8] As part of that evaluation, Dobbs was given a preliminary breath test, which revealed that Dobbs did not have any alcohol in his system. Nearly three hours after Dobbs was first handcuffed and placed in the locked squad car, at 10:19 a.m., Officer Pine first read Dobbs the Miranda warnings. Dobbs waived his Miranda rights and was questioned by Officer Pine.

---

[6] The can of air duster was referred to by a variety of names during the suppression hearing and the jury trial, including DustOff, Ultra Duster, air duster, duster, and compressed air. For ease of reference, we will refer to it as "air duster" throughout this opinion.

[7] During a search of Dobbs's vehicle, Officer Timothy Frey found a Menards receipt for air duster dated the morning of the accident.

[8] There is no audio or visual recording of this evaluation.

5

¶12 Dobbs was then formally placed under arrest, informed that the pedestrian had died, and read the <u>Miranda</u> warnings for a second time by Officer Milton. Dobbs again waived his <u>Miranda</u> rights and agreed to answer questions. Dobbs eventually confessed that he had taken a puff of the air duster while he was driving, passed out, swerved, and then drove away from the scene.

¶13 Dobbs was transported to the City County Building garage where Officer Paul Fleischauer continued to question him. Dobbs confessed to Officer Fleischauer that he had been huffing for pain management, in addition to taking an antidepressant and prescribed pain medication. Dobbs said he had inhaled the air duster while driving, likely striking the pedestrian after he lost consciousness.

¶14 Dobbs was driven to another hospital to receive medical clearance to be booked into the jail. While at that hospital, Officer Van Hove heard Dobbs say twice, unprompted, that he had "taken a puff of Dust-Off and had killed a man" with his vehicle. Officer Van Hove did not ask any follow-up questions in response.

¶15 Shortly thereafter, Dobbs indicated he wanted to call his father, despite being warned that anything he said on the phone could ultimately be used in court. Officer Van Hove overheard Dobbs tell his father that he went to Menards to buy air duster, took a puff on his way home, and then drove over a curb and "killed a man." He also heard Dobbs say "he understood

his rights and wanted to be honest."  Later that night, Officer Bryan Dyer heard Dobbs spontaneously repeat the same story.

¶16  The next morning, despite Officer Dean Baldukas's reminder to Dobbs that he was under arrest "and still had rights associated with that," Dobbs blurted out, unprompted, that he had taken a puff of the air duster.  Additionally, Officers Linda Baehmann and Bryan Dyer overheard similar spontaneous comments from Dobbs regarding huffing air duster.

¶17  Dobbs was ultimately charged with one count of homicide by intoxicated use of a vehicle and one count of hit and run resulting in death.

¶18  Prior to trial, the circuit court heard a number of motions, two of which are relevant to this appeal.  The first was Dobbs's motion to suppress his statements on the grounds that:  (1) he was not read the Miranda warnings despite being subject to custodial interrogation; and (2) all of his statements were not voluntarily made due to his mental and physical condition.  The circuit court denied Dobbs's motion to suppress, concluding that the "first interrogation that would have required a Miranda warning, had the defendant been in custody, was the interview by [Officer] Pine," at 10:19 am, when Officer Pine first read Dobbs the Miranda warnings.  Further, the circuit court concluded that "[e]ach of the statements made by the defendant to Officers Milton, Pine, Kleinfeldt, Van Hove,

7

Dyer, Baldukas, and Baehmann has been demonstrated to have been voluntary and not the product of coercion in any degree."[9]

¶19 The second pre-trial motion relevant to this appeal was the State's motion to exclude the testimony of Dobbs's proffered experts, including Dr. Lawrence White. The defense had named Dr. White to testify generally about the phenomenon of false confessions, as well as the interrogation techniques and dispositional characteristics that make false confessions more likely. The State argued Dr. White's testimony would not be relevant because there was no link between his testimony and the facts surrounding Dobbs's confessions. The State further argued that Dr. White's testimony would confuse the jury, invade the province of the jury as the ultimate assessor of credibility, and re-litigate the voluntariness of Dobbs's statements. In response, Dobbs alleged that Dr. White's testimony would assist the jury by dispelling a common misbelief that an innocent person would never confess to a crime he or she did not commit.

¶20 At the Daubert[10] evidentiary hearing, the State stipulated to Dr. White's qualifications. Dr. White testified that he saw his role as a jury educator, lecturing about the social science and legal scholarship on false confessions and the general psychology behind interrogation techniques and confessions. He detailed the interrogation techniques that

---

[9] Dobbs filed a motion for reconsideration on his motion to suppress, which was denied.

[10] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

could make an innocent person confess: isolation, confrontation with inculpatory evidence, police indifference to claims of innocence, being in custody for over six hours, persistent questioning, minimization of the accused's culpability or the consequences, and implying lenient treatment would be given in return for a confession. Dr. White further described the dispositional characteristics that make a person more vulnerable to confessing falsely when subject to these coercive interrogation techniques, including: youth (under 25 years old), low intelligence, a suggestible or compliant predisposition, mental disorders like anxiety or depression, sleep deprivation, and physical exhaustion. Dr. White affirmed that he did not review any reports or the specific facts of Dobbs's case, and that he would not offer an ultimate opinion on the truthfulness of Dobbs's confessions.

¶21 The circuit court ruled that Dr. White's testimony would not assist the jury because he never reviewed Dobbs's case and therefore could not explicitly apply his expertise to the specific facts of the case. The circuit court determined his proffered testimony was a "lecture" at the "highest level of generality" which could not satisfy the requirement in Wis. Stat. § 907.02(1) (2017-18)[11] that "the witness has applied the principles and methods reliably to the facts of the case."

---

[11] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

¶22 Dobbs moved for reconsideration. The circuit court affirmed its original ruling but articulated a second rationale for excluding Dr. White's exposition testimony: it did not "fit" the particular facts surrounding Dobbs's confessions. Specifically, the circuit court found that Dobbs had made no showing that the police employed the types of coercive techniques that Dr. White would testify about.

¶23 At Dobbs's jury trial, Officers Milton, Dyer, Baldukas, Baehmann, and Van Hove all testified to Dobbs's confessions that he inhaled air duster prior to the accident. Dobbs took the witness stand and denied huffing any air duster while driving on the day of the accident. A jury ultimately found Dobbs guilty of homicide by intoxicated use of a vehicle.[12] Dobbs was sentenced to 20 years imprisonment, consisting of 12 years of initial confinement followed by 8 years of extended supervision.

¶24 Dobbs appealed, challenging the circuit court's decisions granting the State's motion to exclude Dr. White's testimony and denying his motion to suppress his statements.

¶25 The court of appeals affirmed the judgment of conviction in an unpublished, per curiam decision. It determined that the circuit court "reasonably concluded that [Dr. White] would not assist the trier of fact unless [he] also applied his knowledge about false confessions to the specific

---

[12] The jury found Dobbs not guilty on the second count of hit and run.

10

circumstances in Dobbs's case." State v. Dobbs, No. 2018AP319-CR, unpublished slip op., ¶7 (Wis. Ct. App. May 2, 2019). Further, it affirmed the circuit court's decision on Dobbs's motion to suppress based on its determination that Dobbs was not entitled to Miranda warnings because he was not in custody when he was "first placed in the squad car." Id., ¶¶11-14. Additionally, the court of appeals rejected Dobbs's argument that his statements were not voluntarily made. Id., ¶¶15-17.

¶26 Dobbs petitioned this court for review, which we granted. Additionally, we asked the parties to brief the following issue: "Whether the court of appeals' decision is consistent with State v. Morgan, 2002 WI App 124, 254 Wis. 2d 602, 648 N.W.2d 23, and if not, whether Morgan should be overruled."

## II.  STANDARD OF REVIEW

¶27 It is within the circuit court's discretion whether to admit proffered expert testimony. State v. Pico, 2018 WI 66, ¶15, 382 Wis. 2d 273, 914 N.W.2d 95. We review the circuit court's decision under an erroneous exercise of discretion standard and therefore we will not reverse a circuit court's decision if the decision "had a reasonable basis," and "was made in accordance with accepted legal standards and in accordance with the facts of record." Id. (internal quotation marks omitted) (quoting State v. LaCount, 2008 WI 59, ¶15, 310 Wis. 2d 85, 750 N.W.2d 780).

¶28 In evaluating a circuit court's decision on a motion to suppress, we uphold the circuit court's findings of fact

11

unless they are clearly erroneous. State v. Eason, 2001 WI 98, ¶9, 245 Wis. 2d 206, 629 N.W.2d 625. However, we independently apply constitutional principles to the facts as found by the circuit court to ensure that the scope of constitutional protections do not vary from case to case. State v. Turner, 136 Wis. 2d 333, 344, 401 N.W.2d 827 (1987). Whether Dobbs was in custody for purposes of Miranda is a question of law that we review de novo. State v. Mosher, 221 Wis. 2d 203, 211, 584 N.W.2d 553 (Ct. App. 1998).

¶29 Finally, in assessing the circuit court's decision on the voluntariness of Dobbs's statements, we independently apply the constitutional principles of due process to the facts as found by the circuit court. See State v. Hoppe, 2003 WI 43, ¶34, 261 Wis. 2d 294, 661 N.W.2d 407. Whether Dobbs's statements were voluntary is a question we review de novo. Id.

### III. ANALYSIS

¶30 We first address whether the circuit court reasonably exercised its discretion in excluding Dr. White's expert testimony. Next we consider whether any of the statements Dobbs gave before he was read the Miranda warnings should have been suppressed because he was subject to custodial interrogation, and if so, whether admission of those statements was harmless error. Finally we consider the voluntariness of Dobbs's statements in light of his mental and physical condition.

A. The circuit court properly excluded Dr. White's exposition testimony on the grounds that it did not "fit" the facts of the case.

¶31 Dobbs sought to admit the expert testimony of Dr. White, who would have testified generally about interrogation techniques and dispositional factors that can lead an innocent person to falsely confess without directly opining on whether those techniques and factors led Dobbs to give a false confession. We refer to an expert witness testifying in the form of an educational lecture on general principles as exposition testimony. See Daniel D. Blinka, Expert Testimony and the Relevancy Rule in the Age of Daubert, 90 Marq. L. Rev. 173, 219 (2006) ("Expository testimony consists of a lecture or explanation on a specialized subject such as economics, accounting, engineering, medicine, or psychology.").

¶32 The circuit court excluded Dr. White's testimony after determining that it would not assist the trier of fact for two reasons: (1) Dr. White did not know, and thus could not apply his expertise to, the specific facts of the case, contrary to the language of Wis. Stat. § 907.02(1) that the expert witness "appl[y] the principles and methods reliably to the facts of the case"; and (2) Dobbs made no showing that Dr. White's exposition testimony would fit the facts of the case. We will not overturn the circuit court's exercise of discretion if the decision had a "reasonable basis" and was made in accordance with the proper legal standard and the facts in the record. Pico, 382 Wis. 2d 273, ¶15. We accept the circuit court's findings of

13

fact unless they are clearly erroneous. Metro. Assocs. v. City of Milwaukee, 2018 WI 4, ¶25, 379 Wis. 2d 141, 905 N.W.2d 784.

¶33 The admission of expert testimony is governed by Wis. Stat. § 907.02. As originally enacted, § 907.02 permitted expert testimony in the form of an opinion or otherwise as long as the expert witness was qualified, the evidence assisted the trier of fact, and the evidence was relevant. § 907.02 (1973-74); Seifert v. Balink, 2017 WI 2, ¶52, 372 Wis. 2d 525, 888 N.W.2d 816 (lead opinion). This court initially interpreted § 907.02 to permit exposition testimony without requiring an expert to "apply[] those factors to the concrete circumstances of th[e] case" or "stat[e] to the jury his own opinion." Hampton v. State, 92 Wis. 2d 450, 458, 285 N.W.2d 868 (1979). This court's reading of § 907.02 was consistent with the federal interpretation of the identical language as set forth in Federal Rule of Evidence 702 ("Rule 702").[13] See Kopf v. Skyrm, 993 F.2d 374, 378 (4th Cir. 1993) ("An expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to

---

[13] Rule 702 and Wis. Stat. § 907.02 both read:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Pub. L. No. 93-595, 88 Stat. 1926, 1937 (1975); Wis. Stat. § 907.02 (1973-74).

14

the facts." (quoting Fed. R. Evid. 702, Advisory Committee Notes[14] to 1972 Proposed Rule 702)).[15]

¶34 In 2000, Rule 702 was amended to codify the reliability standard articulated in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and its progeny.[16] In 2011, the Wisconsin legislature followed suit, renumbering Wis. Stat. § 907.02 to § 907.02(1) and amending it to expressly "adopt the Daubert reliability standard embodied in Federal Rule of

_____

[14] As Justice Shirley Abrahamson explained in Seifert:

> Under the Rules Enabling Act, 28 U.S.C. § 2072, the United States Supreme Court is authorized to promulgate rules of practice and procedure for the federal courts. This authority is exercised by the Judicial Conference of the United States. The Conference promulgates and changes rules of practice and procedure in the federal courts subject to oversight by the Court. For the Federal Rules of Evidence, the Judicial Conference is aided in its rule-making powers by the Evidence Advisory Committee; the members of and reporter to this Committee are appointed by the Chief Justice of the United States Supreme Court.

Seifert v. Balink, 2017 WI 2, ¶55 n.13, 372 Wis. 2d 525, 888 N.W.2d 816 (lead opinion) (citing Paul R. Rice and Neals-Erik William Delker, Federal Rules of Evidence Advisory Committee: A Short History of Too Little Consequence, 191 F.R.D. 678, 679 (2000)).

[15] Rule 702 served to expressly "encourage the use of expert testimony in non-opinion form when counsel believes the trier can itself draw the requisite inference," as opposed to having an expert witness opine on hypotheticals before the jury. Hampton v. State, 92 Wis. 2d 450, 459, 285 N.W.2d 868 (1979) (quoting Fed. R. Evid. 702, Advisory Committee Notes to 1972 Proposed Rule 702).

[16] See General Electric Co. v. Joiner, 522 U.S. 136 (1997); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).

15

Evidence 702." State v. Kandutsch, 2011 WI 78, ¶26 n.7, 336 Wis. 2d 478, 799 N.W.2d 865; see also State v. Jones, 2018 WI 44, ¶7, 381 Wis. 2d 284, 911 N.W.2d 97 ("These changes [to § 907.02] adopted the federal standard, which incorporates the analysis promulgated in Daubert . . . .") (citing Seifert, 372 Wis. 2d 525, ¶6); 2011 Wis. Act 2, Wis. S. Amend. Memo, 2011 Jan. Spec. Sess. S.B. 1 ("This language [in § 907.02(1)] is identical to the language of Rule 702 of the Federal Rules of Evidence."). Section 907.02(1) now reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

2011 Wis. Act 2, § 34m (emphasis added to signify added language).

¶35 Whether the Daubert reliability standard expressly adopted in Wis. Stat. § 907.02(1) altered Wisconsin's long-standing practice of allowing expert exposition testimony is a question of first impression. In answering this question, we begin with the text of § 907.02(1). State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110. We interpret the statutory language in the context in which it is used, not in isolation, and we consider prior case law in this inquiry as it "may illumine how we have

16

previously interpreted or applied the statutory language." Augsburger v. Homestead Mut. Ins. Co., 2014 WI 133, ¶16, 359 Wis. 2d 385, 856 N.W.2d 874 (quoting Belding v. Demoulin, 2014 WI 8, ¶16, 352 Wis. 2d 359, 843 N.W.2d 373). Since § 907.02(1) is identical to the language of Rule 702, we also look to the federal interpretation of Rule 702 for guidance. See State v. Poly-America, Inc., 164 Wis. 2d 238, 246, 474 N.W.2d 770 (1991) ("When a state statute is modeled after a federal rule, we look to the federal interpretation of that rule for guidance and assistance."). Lastly, although not dispositive, we consider how other state courts have interpreted analogous state laws. See Seifert, 372 Wis. 2d 525, ¶55 (lead opinion).

¶36 The text of Wis. Stat. § 907.02(1) permitting an expert to testify "in the form of an opinion or otherwise" remains unchanged by the addition of the Daubert reliability standard. See Wis. Stat. § 907.02(1). As we recognized in Hampton, the phrase "or otherwise" signifies that expert testimony may take a form other than an opinion, which courts should encourage when the trier of fact can itself draw the

17

requisite inference from the facts of the case.[17]  Hampton, 92 Wis. 2d at 459; see also Hagenkord v. State, 100 Wis. 2d 452, 463, 302 N.W.2d 421 (1981) ("Testimony by experts is not limited to giving opinions or to the stating of facts derived from specialized knowledge.").  A reading of § 907.02(1) that requires an expert to apply his or her expertise to the facts of the case would result in an expert always providing some type of

_____

[17] Circuit courts need this flexibility to limit otherwise relevant and reliable expert testimony that, if given in the form of an opinion, would invade the prerogative of the finder of fact.  See Hampton, 92 Wis. 2d at 458 (holding that the circuit court did not erroneously exercise its discretion by limiting an eyewitness identification expert to only provide exposition testimony rather than rendering an opinion on the reliability of any of the eyewitnesses' identifications in the case); 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 608.3, at 560 (4th ed.) ("Indeed, the supreme court has encouraged the use of expert evidence in non-opinion form because such expository testimony assists the jury while minimizing the risk that the jury will surrender its autonomy to the expert.  A judge reluctant to introduce Jensen evidence may nonetheless permit exposition to assist the jury without sacrificing the record." (footnote omitted) (citing State v. Jensen, 147 Wis. 2d 240, 256, 432 N.W.2d 913 (1988))).

an opinion about the matter[18] and would render the phrase "or otherwise" inoperative. Such a reading would violate this court's interpretive canon "to give reasonable effect to every word" in a statute. Kalal, 271 Wis. 2d 633, ¶46.

¶37 There is a reasonable reading of Wis. Stat. § 907.02(1) that gives effect to both the language "or otherwise" and the condition that "the witness has applied the principles and methods reliably to the facts of the case." If the expert is testifying in the form of an opinion, he or she is applying the principles or methods to the specific facts of the case and must therefore do so reliably. If, however, the expert is testifying in a form other than an opinion, such as an exposition, then the expert would not be applying principles or

_____

[18] For example, in this case, if Dr. White applied the principles and methods to the facts of the case, he would be giving an opinion on whether or not Dobbs's dispositional factors combined with the police interrogation techniques could have resulted in Dobbs falsely confessing. It is important to recognize that if Dr. White offered such an opinion, it would invade the province of the factfinder as the sole determiner of credibility. Cf. State v. Kleser, 2010 WI 88, ¶104, 328 Wis. 2d 42, 786 N.W.2d 144 ("The essence of the rule prohibiting vouching testimony is that such testimony invades the province of the fact-finder as the sole determiner of credibility." (citing State v. Haseltine, 120 Wis. 2d 92, 95-96, 352 N.W.2d 673 (Ct. App. 1984))). Even if Dr. White had simply been asked whether any of the factors he described in his exposition testimony related to Dobbs's case, his response would be offering his view about whether his exposition testimony relates to the particular facts in Dobbs's case. This is the very definition of an opinion. See "Opinion," Merriam-Webster Online Dictionary (2020), https://www.merriam-webster.com/dictionary/opinion ("[A] view . . . formed in the mind about a particular matter.").

19

methods to the facts of the case and it would be nonsensical to require him or her to do so reliably.

¶38 A reading of Wis. Stat. § 907.02(1) permitting exposition testimony is consistent with the intent of the drafters of Rule 702, as evidenced by the Advisory Committee Notes to the 2000 Amendment. See Guertin v. Harbour Assur. Co. of Bermuda, 141 Wis. 2d 622, 628-29, 415 N.W.2d 831 (1987) ("The 'written comments of legislatively created advisory committees are relevant in construing statutes and ascertaining the legislative intent of statutes recommended by such committees.'" (quoting Champlin v. State, 84 Wis. 2d 621, 625, 267 N.W.2d 295 (1978))). The Advisory Committee Notes to the 2000 Amendment clarify that the amendment was not intended to alter the established practice of admitting exposition testimony without requiring an expert to apply those principles to the facts of the case.

> If an expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably. It might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles.

Fed. R. Evid. 702, Advisory Committee Notes to the 2000 Amendment (emphasis added). The drafters of Rule 702(d)

20

intended it to mean that <u>if</u> the expert gives opinion testimony, then the expert must reliably apply the principles and methods to the facts of the case.

¶39 Federal courts of appeals also uniformly interpret Rule 702 to continue to permit the admission of exposition testimony without an expert applying general principles to the specific facts of the case. For example, "[t]he federal courts uniformly hold . . . that government agents or similar persons may testify as to general practices of criminals to establish the defendants' modus operandi." <u>United States v. Mejia-Luna</u>, 562 F.3d 1215, 1219 (9th Cir. 2009); <u>see also</u> <u>United States v. Skyers</u>, 787 F. App'x 771, 774 (2d Cir. 2019) (summary order) (upholding admission of a detective's expert testimony that "generally explained" a drug trafficking circle because it "was relevant to helping the jury understand the general nature of international narcotics trafficking organizations"); <u>United States v. Reed</u>, 788 F. App'x 903, 906 (4th Cir. 2019) (unpublished per curiam) ("Rule 702 did not require [the expert witness] to explicitly link his testimony to the specific facts of [the] case."); <u>United States v. Galatis</u>, 849 F.3d 455, 462 (1st Cir. 2017) (holding a Medicare-fraud investigator could describe the applicable regulatory regime without ever applying the regulations to the facts of the case or suggesting that any actions had violated the law); <u>Lapsley v. Xtek, Inc.</u>, 689 F.3d 802, 809 (7th Cir. 2012) ("As the Rule 702 committee notes . . . make clear, an expert may . . . 'give a dissertation or exposition of scientific or other principles relevant to the

21

case, leaving the trier of fact to apply them to the facts.'" (quoting Fed. R. Evid. 702, Advisory Committee Notes to 1972 Proposed Rule 702)).

¶40 Federal courts acknowledge that an expert need not even know the specific facts of the case to satisfy the requirements of Rule 702. See United States ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 893-96 (D.C. Cir. 2010) (per curiam) (upholding the admission of an expert witness who had no direct knowledge of the facts in the case, but whose testimony on how bid-rigging cartels work in general was sufficiently connected to the facts to be relevant and helpful to the jury); see also United States v. Warren, 774 F. App'x 778, 780-82 (4th Cir. 2019) (unpublished per curiam) (concluding that a FBI agent, "who acknowledged that he had no information regarding the facts of [the] case," could permissibly "testif[y] generally about human trafficking" to put the case into context for the jury); United States v. Brinson, 772 F.3d 1314, 1319-20 (10th Cir. 2014) (rejecting the argument that an expert without knowledge of the specific case facts was unreliable because he testified generally "about characteristics of the prostitution trade" rather than "about case-specific facts").

¶41 State supreme courts faced with this issue have likewise interpreted state statutes modeled after Rule 702 to allow for the admission of expert exposition testimony. The Arizona Supreme Court was recently faced with a claim that the same statutory language——"the expert has reliably applied the

22

principles and methods to the facts of the case"——necessitates that the expert have knowledge of, and apply his or her expertise to, the particular facts of the case. State v. Salazar-Mercado, 325 P.3d 996 (Ariz. 2014) (interpreting Ariz. R. Evid. 702). Citing federal case law and the Advisory Committee Notes, the Arizona Supreme Court held that its expert testimony rule "does not bar admission of 'cold' expert testimony that educates the trier of fact about general principles but is not tied to the particular facts of the case."[19] Id. at 997-99, 1001. The South Dakota Supreme Court likewise reached the same conclusion. See State v. Johnson, 860 N.W.2d 235, 247-48 (S.D. 2015) ("[A]n expert's testimony may be admissible [pursuant to S.D. Stat. § 19-19-702] even if the expert's sole function is 'to educate the factfinder about general principles, without ever attempting to apply [those] principles to the specific facts of the case.'" (alteration in original) (quoting Salazar-Mercado, 325 P.3d at 999)); see also

---

[19] In a similar vein, the Utah Supreme Court recognized that its state's adoption of the Rule 702 language resolved the "Catch-22" expert witnesses faced when testifying to eyewitness reliability. State v. Clopten, 223 P.3d 1103, 1106-07, 1114 (Utah 2009) (interpreting Utah R. Evid. 702 (2009)). Under Utah's prior rule, eyewitness experts whose testimony was too specific would be excluded for invading the province of the factfinder, while experts whose testimony was too general would be excluded for lecturing rather than dealing with the specific facts of the case. Id. The Utah Supreme Court concluded that the recent amendment to its own expert witness rule adopting the language of Rule 702 now permitted an eyewitness expert to "'give a dissertation or exposition' of factors found in the case that are understood to contribute to eyewitness inaccuracy." Id. at 1114.

State v. Marshall, 596 S.W.3d 156, 160-62 (Mo. Ct. App. 2020) (interpreting Mo. Stat. § 490.065.2(1)).

¶42 We conclude that Wis. Stat. § 907.02(1) continues to permit an expert witness to testify in the form of an opinion "or otherwise," including exposition testimony on general principles without explicitly applying those principles to, or even having knowledge of, the specific facts of the case. If an expert testifies in the form of an opinion, then the expert must apply the principles and methods reliably to the facts of the case.

¶43 Our inquiry does not end there, however, because the admissibility of exposition testimony pursuant to Wis. Stat. § 907.02(1) is not automatic. "[T]he trial judge stands as a gatekeeper to prevent irrelevant or unreliable testimony from being admitted." Lapsley, 689 F.3d at 809; see also Jones, 381 Wis. 2d 284, ¶¶31-32 ("[T]he heightened standard under the amended Wis. Stat. § 907.02(1) does not change this gatekeeping function."). When expert testimony is proffered in the form of an exposition on general principles, the circuit court, as gatekeeper, must consider the following four factors: (1) whether the expert is qualified; (2) whether the testimony will address a subject matter on which the factfinder can be assisted by an expert; (3) whether the testimony is reliable;

24

and (4) whether the testimony will "fit" the facts of the case.[20] 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 702.4032, at 673-74 (4th ed. 2017) (citing Fed. R. Evid. 702, Advisory Committee Notes to the 2000 Amendment). The party proffering the expert testimony bears the burden of satisfying each of these preliminary questions by a preponderance of the evidence. Wis. Stat. § 901.04; see also

---

[20] This four-part inquiry is consistent with how federal courts analyze exposition testimony. See, e.g., United States ex rel. Miller v. Bill Harbert Int'l Const., Inc., 608 F.3d 871, 894-96 (D.C. Cir. 2010) (per curiam); Burton v. Am. Cyanamid, 362 F. Supp. 3d 588, 601-02 (E.D. Wis. 2019); Emblaze Ltd. v. Apple Inc., 52 F. Supp. 3d 949, 959-61 (N.D. Cal. 2014); Konikov v. Orange Cty., 290 F. Supp. 2d 1315, 1317 (M.D. Fla. 2003); Magistrini v. One Hour Martinizing Dry Cleaning, 180 F. Supp. 2d 584, 612 n.30 (D.N.J. 2002), aff'd, 68 F. App'x 356 (3d Cir. 2003); TC Sys. Inc. v. Town of Colonie, 213 F. Supp. 2d 171, 175, 178-79 (N.D.N.Y. 2002); see also Fed. R. Evid. 702, Advisory Committee's Notes to 2000 Amendments; 32 C.J.S. Evidence § 801 (2020); Daniel D. Blinka, Expert Testimony and the Relevancy Rule in the Age of Daubert, 90 Marq. L. Rev. 173, 219 & n.215 (2006). State courts with an expert evidentiary rule modeled after Rule 702 similarly recognize this test as the proper one for exposition testimony. See State v. Johnson, 860 N.W.2d 235, 248 (S.D. 2015); State v. Marshall, 596 S.W.3d 156, 160-61 (Mo. Ct. App. 2020).

These considerations differ slightly from the considerations to admit opinion testimony of an expert: (1) whether the scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (2) whether the expert is qualified as an expert by knowledge, skill, experience, training, or education; (3) whether the testimony is based upon sufficient facts or data; (4) whether the testimony is the product of reliable principles and methods; and (5) whether the witness has applied the principles and methods reliably to the facts of the case. State v. Jones, 2018 WI 44, ¶29, 381 Wis. 2d 284, 911 N.W.2d 97.

25

Seifert, 372 Wis. 2d 525, ¶58 (lead opinion) (citing Daubert, 509 U.S. at 593); Blinka, supra, § 702.403, at 672.

¶44 Fit "goes primarily to relevance," Daubert, 509 U.S. at 591, and is tied to the gatekeeping function the circuit courts perform under Wis. Stat. § 904.01. Whether expert testimony "fits" a case turns on whether it is "sufficiently tied to the facts of the case" such that "it will aid the jury in resolving a factual dispute." Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (1985)). "[E]xpert testimony is helpful to the jury," or fits, "if it concerns a matter beyond the understanding of the average person, assists the jury in understanding facts at issue, or puts the facts in context." United States v. Welch, 368 F.3d 970, 974 (7th Cir. 2004), judgment vacated on other grounds, 543 U.S. 1112 (2005). Establishing the fit of exposition testimony is particularly important because, unlike opinion testimony, exposition testimony does not in and of itself explicitly connect the witness's expertise to the particular facts of the case. See Trout v. Milton S. Hershey Med. Ctr., 576 F. Supp. 2d 673, 677 (M.D. Pa. 2008) ("Generalized expert testimony that is factually disconnected from the case is inadmissible because it does not assist the jury in rendering a verdict based on the material facts in issue.") (citing Elcock v. Kmart Corp., 233 F.3d 734, 755 n.12 (3d Cir. 2000)).

¶45 In this case, the circuit court determined that Dr. White's exposition testimony did not fit the particular

26

facts of Dobbs's case because Dobbs "made no showing that the types of tactics that were employed in [his] case would correspond to any of the generalized opinions that Dr. White holds about false confessions and police interrogations." We conclude that the circuit court applied the proper legal standard for admission of exposition testimony in assessing the fit of Dr. White's testimony to the facts of the case. We therefore uphold its exercise of discretion so long as the circuit court had "a reasonable basis," applying the proper legal standard "in accordance with the facts of record." Pico, 382 Wis. 2d 273, ¶15 (quoting LaCount, 310 Wis. 2d 85, ¶15).

¶46 Dr. White testified that he would educate the jury on police interrogation techniques that could make an innocent person confess: isolation, confrontation with inculpatory evidence, police indifference to claims of innocence, being in custody for over six hours, persistent questioning, minimization of the accused's culpability or the consequences, and implying lenient treatment will be given in return for a confession. Dr. White also testified he would educate the jury on dispositional characteristics that, when combined with those police interrogation techniques, make an accused person more vulnerable to falsely confessing: youth (under 25 years old), low intelligence, a suggestive or compliant predisposition, mental disorders like anxiety or depression, sleep deprivation, and physical exhaustion.

¶47 According to Dobbs, Dr. White's testimony would have assisted the jury in assessing the truthfulness of Dobbs's

27

confessions to police by correcting a common misbelief that innocent people do not confess to crimes they did not commit. Dobbs further argues that he established a "fit" with his circumstances and Dr. White's testimony based on his dispositional factors——anxiety, depression, and sleep deprivation——combined with the police using the interrogation technique of confronting him with evidence suggesting his guilt.

¶48 We acknowledge that the circuit court could have found this narrow overlap provided a sufficient fit between Dr. White's testimony and the facts of Dobbs's case.[21] This is a matter of circuit court discretion, however, and therefore our role on review is to "search the record for reasons to sustain the circuit court's exercise of discretion." Pico, 382 Wis. 2d 273, ¶15 (quoting LaCount, 310 Wis. 2d 85, ¶15).

---

[21] The Innocence Project, Inc. and The Wisconsin Innocence Project, as amicus curiae, argue that once the presence of even one of the recognized risk factors is shown, the Daubert threshold for fit is satisfied and at that point the circuit court loses any discretion in the matter. A circuit court, in its discretion, might reasonably decide that the testimony is not beyond the understanding of the average person, does not assist the jury in understanding facts at issue, or does not put the facts in context. United States v. Welch, 368 F.3d 970, 974 (7th Cir. 2004), judgment vacated on other grounds, 543 U.S. 1112 (2005).

Additionally, the circuit court may always exclude expert testimony, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Wis. Stat. § 904.03.

¶49 The circuit court found that Dobbs was not subject to most of the types of coercive interrogation techniques described by Dr. White. Dobbs had not been in custody for over six hours, was not persistently interrogated while in custody, nor was he isolated for much of that time. The police did not attempt to lessen his culpability or offer him leniency if he confessed. The police did not fabricate incriminating evidence. The record further contains at least six instances of Dobbs spontaneously admitting to huffing the air duster absent any coercive police tactics.

¶50 Additionally, our review of the record indicates that Dobbs did not possess most of the characteristics that Dr. White would testify may predispose an individual to falsely confess if coercive interrogation techniques were used. Dobbs was not younger than 25 years old and did not claim to be of low intelligence or particularly suggestible.

¶51 The circuit court could have reasonably concluded that Dr. White's exposition testimony regarding situational factors that increase the likelihood of false confessions would not assist the trier of fact to understand the evidence, especially in light of the numerous spontaneous confessions introduced into evidence. See United States v. Mamah, 332 F.3d 475, 477-78 (7th Cir. 2003) (upholding the exclusion of expert testimony for lack of fit where the defendant had previously been subjected to coercive interrogation tactics, but the confession at issue was made at a later point when the defendant was not subjected to those tactics). We conclude that the circuit court properly

exercised its discretion in excluding Dr. White's testimony on the grounds that it did not sufficiently fit the facts of Dobbs's case.

**B. Dobbs was subject to custodial interrogation without being read Miranda warnings, but the admission of those statements was harmless error.**

¶52 Dobbs moved to suppress the statements he made from approximately 7:30 a.m. to 10:19 a.m. on the grounds that he was subject to custodial interrogation and not read the Miranda warnings, violating his Fifth Amendment right against self-incrimination. The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."[22] In order to protect the rights secured by the Fifth Amendment, the United States Supreme Court held that the government "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Pursuant to Miranda, no suspect may be subjected to custodial interrogation until he is "warned that he has a right to remain silent, that any statement

---

[22] The Wisconsin Constitution similarly provides that "[n]o person . . . may be compelled in any criminal case to be a witness against himself or herself." Wis. Const. Art. I, § 8. This court has generally interpreted this provision consistent with the United States Supreme Court's interpretation of the Fifth Amendment to the federal Constitution. See State v. Ward, 2009 WI 60, ¶18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236.

he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id. Incriminating statements made in violation of Miranda must be suppressed, id., unless the admission of the statements was harmless error.

¶53 Since custody is "a necessary prerequisite to Miranda protections," we must first resolve whether Dobbs was "in custody," as that term is understood in the Miranda context. State v. Lonkoski, 2013 WI 30, ¶23, 346 Wis. 2d 523, 828 N.W.2d 552. A person is in custody for Miranda purposes if "there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest." State v. Bartelt, 2018 WI 16, ¶31, 379 Wis. 2d 588, 906 N.W.2d 684 (quoted source omitted); see also California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam) ("Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (quoted source omitted)).

¶54 This objective test requires us to examine the totality of the circumstances. See Bartelt, 379 Wis. 2d 588, ¶¶31-32; see also Thompson v. Keohane, 516 U.S. 99, 112-13 (1995). There are several factors we consider, including: "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." State v. Martin, 2012 WI 96, ¶35, 343 Wis. 2d 278, 816 N.W.2d 270

31

(quoting Morgan, 254 Wis. 2d 602, ¶12). When evaluating the "degree of restraint," we consider "whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." Morgan, 254 Wis. 2d 602, ¶12.

¶55 As the State conceded, in both its brief[23] and at oral argument,[24] Dobbs was in custody at some point while he was being questioned in the squad car and therefore Miranda warnings were required well before Officer Pines first read them at 10:19 a.m. While we accept that concession, we also explain why, under the totality of the circumstances, a reasonable person in Dobbs's position would have felt a restraint on his freedom of movement of a degree associated with formal arrest and why he was

---

[23] For example, the State conceded that "Dobbs's statements in response to inquisitorial questions before he waived his Miranda rights probably should have been suppressed because Dobbs was probably in custody at some point while he was being questioned."

[24] As the assistant attorney general conceded at oral argument:

At some point when you look at the [State v. Bartelt, 2018 WI 16, 379 Wis. 2d 588, 906 N.W.2d 684] factors, it would appear that at some point because he was frisked, he was handcuffed, he was in the back of a locked squad car, and he was asked some questions, some of which were not inquisitorial and some of them may have been. So I think at some point during that hour, it is likely that it changed into a custodial type situation.

32

therefore in custody for purposes of Miranda. But first, we answer the question we presented to the parties: "Whether the court of appeals' decision is consistent with State v. Morgan, 2002 WI App 124, 254 Wis. 2d 602, 648 N.W.2d 23, and if not, whether Morgan should be overruled."

¶56 In Morgan, 254 Wis. 2d 602, ¶13, the court of appeals emphasized that the analyses required by the Fourth Amendment and Fifth Amendment are distinct, despite some lack of clarity in the case law. See United States v. Smith, 3 F.3d 1088, 1096 (7th Cir. 1993) ("[O]ur inquiry into the circumstances of temporary detention for a Fifth and Sixth Amendment Miranda analysis requires a different focus than that for a Fourth Amendment Terry[25] stop."). The court of appeals in this case fell prey to this confusion when it relied upon Blatterman, a Fourth Amendment case, to resolve Dobbs's Fifth Amendment claim.[26] See Dobbs, No. 2018AP319-CR, ¶¶12-13 (per curiam) (relying exclusively on State v. Blatterman, 2015 WI 46, 362 Wis. 2d 138, 864 N.W.2d 26).

---

[25] Terry v. Ohio, 392 U.S. 1 (1968).

[26] In her concurrence in Martin, then-Chief Justice Shirley Abrahamson made a "cautionary point" that "[i]t is possible that some past cases have cited Fourth Amendment cases while deciding Fifth Amendment issues or cited Fifth Amendment cases while deciding Fourth Amendment issues. Going forward, this court should be cautious to avoid conflating closely related constitutional standards and analyses." State v. Martin, 2012 WI 96, ¶¶72, 77, 343 Wis. 2d 278, 816 N.W.2d 270 (Abrahamson, C.J., concurring).

¶57 We uphold Morgan and clarify that the Fourth Amendment and Fifth Amendment protect different interests and involve different inquiries. A claimed violation of a defendant's Fourth Amendment rights involves balancing the government's interest in crime prevention against an individual's right to be free from government intrusion. See Morgan, 254 Wis. 2d 602, ¶14 (citing Terry v. Ohio, 392 U.S. 1, 19-27 (1968)). When evaluating a Terry stop under the Fourth Amendment, this court considers the totality of the circumstances leading up to the stop and focuses on "the reasonableness of the officers' actions in the situation facing them." State v. Miller, 2012 WI 61, ¶30, 341 Wis. 2d 307, 815 N.W.2d 349 (quoted source omitted).

¶58 The Fifth Amendment protects a different interest: the right not to be compelled to incriminate oneself. Morgan, 254 Wis. 2d 602, ¶15. We require Miranda warnings to be given based on the need to protect the fairness of a criminal defendant's trial. Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 240 (1973)). It is well-settled that at the point in time where an individual's freedom of action is "curtailed to a 'degree associated with a formal arrest'" under the totality of the circumstances, the safeguards of Miranda become applicable. Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (quoting Beheler, 463 U.S. at 1125).

¶59 A brief detention, such as a traffic stop, typically does not rise to the level of "custody" for purposes of Miranda. See Berkemer, 468 U.S. at 437-40. However, if under the totality of the circumstances a detained motorist's freedom of

34

action is curtailed to a degree associated with a formal arrest, he or she is entitled to the "full panoply of protections prescribed by Miranda." Id. at 440 (citing Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per curiam)); see State v. Griffith, 2000 WI 72, ¶69 n.14, 236 Wis. 2d 48, 613 N.W.2d 72 (noting that the United States Supreme Court has "made clear that if a detained motorist is treated in such a manner that he or she is rendered 'in custody' for practical purposes, Miranda protections are triggered."); State v. Gruen, 218 Wis. 2d 581, 594, 582 N.W.2d 728 (Ct. App. 1998) ("[T]he fact that a defendant was detained pursuant to a Terry stop does not automatically dispel the need for Miranda warnings.").

¶60 We therefore recognize the distinction between an analysis of a violation of the Fourth and Fifth Amendment as aptly described in Morgan, 254 Wis. 2d 602, ¶¶13-16. Having clarified this framework and identified the court of appeals' error in relying on Blatterman, 362 Wis. 2d 138, we return to the facts of Dobbs's case.

¶61 We conclude that Dobbs was in custody for purposes of Miranda protections because, under the totality of the circumstances, a reasonable person would have considered himself restrained to a degree associated with formal arrest. See Martin, 343 Wis. 2d 278, ¶¶34-35. First, Dobbs was never free to leave from the moment Officer Milton blocked Dobbs's vehicle and handcuffed him in a locked squad car. In each of the locations Dobbs was taken, he was either locked in, guarded by armed law enforcement, or both. This was not like a routine

35

traffic stop where if Dobbs had successfully performed the field sobriety tests, he would have been free to leave. See State v. Swanson, 164 Wis. 2d 437, 452, 475 N.W.2d 148, abrogated on other grounds by State v. Sykes, 2005 WI 48, 279 Wis. 2d 742, 695 N.W.2d 277 ("A reasonable person would understand a request to perform a field sobriety test to mean that if he or she passed the test, he or she would be free to leave.").

¶62 Second, as to the "place[] and length of the interrogation," Martin, 343 Wis. 2d 278, ¶35, Dobbs was initially questioned by Officer Milton in his parked, locked squad car from 7:31 a.m. until 8:52 a.m., with a short break to complete field sobriety tests. Dobbs was then subjected to more questioning at the hospital by several armed officers. Unlike a brief traffic stop, the place of interrogation did not expose Dobbs to public view and would have caused a reasonable person to feel completely at the mercy of police. See Berkemer, 468 U.S. at 437-40.

¶63 Ultimately, Dobbs was not read the Miranda warnings until almost three hours after he was first handcuffed and put in the backseat of a locked squad car. Three hours is significantly longer than the 30 minutes of questioning in a patrol car that the United States Supreme Court has implied rises to the level of custody for purposes of Miranda. On multiple occasions the Supreme Court has cited favorably to Commonwealth v. Meyer, 412 A.2d 517 (Pa. 1980), which concluded that a driver was in custody for purposes of Miranda when he was detained for over 30 minutes, part of the time in a patrol car,

36

and subject to questioning. See Berkemer, 468 U.S. at 427 nn.7 & 8, 441 n.34; see also Pennsylvania v. Bruder, 488 U.S. 9, 11 n.2 (per curiam) ("[T]he motorist in Meyer could be found to have been placed in custody for purposes of Miranda safeguards because he was detained for over half an hour, and subjected to questioning while in the patrol car.").

¶64 Lastly, we examine the degree of restraint, which includes "whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." Morgan, 254 Wis. 2d 602, ¶12. A degree of restraint was used when Officer Milton initially blocked Dobbs's car and ordered him out while holding onto his service weapon. Dobbs was then frisked, handcuffed, and locked in the backseat of Officer Milton's squad car while being questioned for the first hour. Dobbs was not told "no" when he asked whether he was going to be arrested and whether he was going to jail. Cf. State v. Quigley, 2016 WI App 53, ¶¶36-43, 370 Wis. 2d 702, 883 N.W.2d 139 (holding that the defendant was not in custody for purposes of Miranda where he was told numerous times during questioning in an unlocked room that he was not under arrest and was free to leave). Dobbs was also surrounded by multiple officers at all times on the scene and at the hospital, as many as four officers at one time.

¶65 Unlike in Gruen, 218 Wis. 2d at 598, where the defendant was not in custody for purposes of Miranda because he

37

was only held in a police van for 10-15 minutes without handcuffs and asked "three short, general, common-sense investigatory questions," Dobbs was initially questioned for an hour while handcuffed in a locked squad car. Just as the defendants in New York v. Quarles, 467 U.S. 649, 655 (1984), and Morgan, 254 Wis. 2d 602, were determined to be in custody for purposes of Miranda because they were surrounded by multiple officers and handcuffed[27] at the time of questioning,[28] Dobbs's freedom was restricted to the degree associated with formal arrest.

¶66 Having concluded that, under the totality of the circumstances, Dobbs was in custody for purposes of Miranda well before 10:19 a.m., we must next ascertain whether he was subject to interrogation. Custodial interrogation can take two forms: express questioning or its functional equivalent. See State v. Harris, 2017 WI 31, ¶15, 374 Wis. 2d 271, 892 N.W.2d 663; see also Rhode Island v. Innis, 446 U.S. 291, 301 (1980) ("[T]he term 'interrogation' under Miranda refers not only to express

---

[27] While we have recognized that the use of handcuffs alone "does not in all cases render a suspect in custody for Miranda purposes," Martin, 343 Wis. 2d 278, ¶34, this case involves other factors relevant to the degree of restraint.

[28] These cases are distinguishable from Torkelson, where the court concluded that a reasonable person in the defendant's position "would not believe his freedom was restricted to a 'degree associated with formal arrest'" after being briefly questioned by one officer in an area open to the public and not handcuffed or physically restrained. State v. Torkelson, 2007 WI App 272, ¶20, 306 Wis. 2d 673, 743 N.W.2d 511 (quoted source omitted).

questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (footnotes omitted). "Express questioning" does not encompass every inquiry that is directed to a suspect, it covers only those "designed to elicit incriminatory admissions." Harris, 374 Wis. 2d 271, ¶16 (quoting Pennsylvania v. Muniz, 496 U.S. 582, 602 n.14 (1990)). Therefore, it is "the nature of the information the question is trying to reach" that determines whether a question is inquisitorial. Id., ¶17.

¶67 As the State concedes, Officer Milton's questions and statements about the damage to Dobbs's vehicle, his depression and anxiety, and injuries to his face were intended to illicit incriminatory admissions and therefore were likely inquisitorial.[29] Accordingly, we conclude that under the

---

[29] We need not determine which questions and statements were intended to illicit incriminatory admissions. However, the questions Officer Milton asked Dobbs included:

- Do you have any medical issues other than that splint that you were wearing?"

- "Do you take medications for depression and anxiety?"

- "Do you have any injuries from the collision with the curb?

- "So [those bruises and scratches on your face] are all old?"

39

totality of the circumstances, Dobbs was subject to custodial interrogation for purposes of Miranda.[30] Therefore, it was error for at least some of Dobbs's pre-Miranda statements to be admitted at trial. However, because we determine the error in admitting Dobbs's statements was harmless, we need not resolve precisely which statements should have been suppressed by the circuit court.

¶68 Admitting Dobbs's pre-Miranda statements was harmless error if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." Martin, 343 Wis. 2d 278, ¶45 (quoted source omitted). Accordingly, the State must prove "that the error complained of

---

We also note that Officer Milton's comments "I smell alcohol" and "its obvious you hit something" could also be considered the functional equivalent to express questioning.

[30] Rejecting the State's concession that Dobbs was subject to custodial interrogation because she finds it "ill-advised," Justice Ziegler reframes this case in a way that was neither briefed nor argued by the parties: "To me, the actual issue in this case is whether law enforcement's investigatory detention of Dobbs under Terry turned into custody under Miranda for Fourth and Fifth Amendment purposes." Justice Ziegler's concurrence, ¶101. Justice Ziegler further declares that "The extent to which a stop can be reasonable under Terry for Fourth Amendment purposes and, nonetheless, render the suspect in custody under Miranda for Fifth Amendment purposes is an issue subject to a federal circuit court split." Id., ¶99. Although the discussion that follows demonstrates that a few circuits simply frame the issue differently, as opposed to being "split," we focus only on whether Dobbs was in custody for purposes of Miranda, which the State expressly concedes. See Springer v. Nohl Elec. Prods. Corp., 2018 WI 48, ¶40, 381 Wis. 2d 438, 912 N.W.2d 1 ("[T]he court must always be careful not to gratuitously address issues unnecessary to the resolution of the matter before us").

did not contribute to the verdict obtained." State v. Mayo, 2007 WI 78, ¶47, 301 Wis. 2d 642, 734 N.W.2d 115 (quoted source omitted).

¶69 All of Dobbs's incriminating statements about huffing air duster before hitting the pedestrian were made to Officers Milton and Fleischauer following Dobbs's waiver of his Miranda rights, or were made to officers, hospital staff, and his father spontaneously. To the extent that Dobbs's five pre-Miranda statements introduced into evidence were incriminating, they were also independently testified to by other witnesses or were inconsequential to the crime of homicide by intoxicated use of a vehicle, the only crime for which Dobbs was convicted.

¶70 First, Officer Milton testified that Dobbs told him "he had gone to Menards and he was on his way home." This fact was independently introduced by Officer Frey, who found the Menards receipt for air duster dated the morning of the accident. Second, Officer Milton testified that Dobbs "admitted to having hit a curb," a fact that a witness to the accident testified to at trial. Third, Dobbs told Officer Milton he "had a few beers the previous evening," but the jury heard that there was no alcohol detected in Dobbs's blood. Fourth, Dobbs told Officer Milton that he "suffered from depression and anxiety and he took medications for those conditions, as well as painkillers." Dobbs testified at trial about his medical conditions and his medications. Finally, the jury heard that Dobbs said "none of the injuries on his face were as a result of the accident." However, identifying when Dobbs received his

facial injuries was not relevant to proving he committed homicide by intoxicated use of a vehicle. We therefore conclude that any error in admitting Dobbs's pre-Miranda statements "did not contribute to the verdict obtained," and was harmless.

C. All of Dobbs's statements were voluntary.

¶71 In the alternative, Dobbs moved to suppress his statements both before and after he was read the Miranda warnings because he alleged they were not voluntarily made. In its written decision, the circuit court merely said: "Each of the statements made by the defendant to Officers Milton, Pine, Kleinfeldt, Van Hove, Dyer, Baldukas and Baehmann has been demonstrated to have been voluntary and not the product of coercion in any degree."

¶72 When a defendant challenges the voluntariness of the statements he made to law enforcement the State bears the burden of showing by a preponderance of the evidence that the statements were voluntary. See State v. Moore, 2015 WI 54, ¶55, 363 Wis. 2d 376, 864 N.W.2d 827. We evaluate voluntariness in light of all the circumstances surrounding the interrogation and balance the defendant's personal characteristics against the actions of law enforcement. See id., ¶56. We cannot properly label a statement involuntary unless there is "some affirmative evidence of improper police practices deliberately used to procure a confession." Id. (quoting State v. Clappes, 136 Wis. 2d 222, 239, 401 N.W.2d 759 (1987). A defendant's personal characteristics alone "cannot form the basis for finding that the suspect's confessions, admissions, or statements are

42

involuntary." Moore, 363 Wis. 2d 376, ¶56; see Hoppe, 261 Wis. 2d 294, ¶37 ("Coercive or improper police conduct is a necessary prerequisite for a finding of involuntariness." (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986))); Clappes, 136 Wis. 2d at 239.

¶73 Dobbs asks this court to conclude that his statements to the police were involuntary without providing any evidence of improper police conduct or coercion. Instead, he points solely to his personal characteristics, namely his "physical and emotional duress" on September 5, 2015, including:

- his swollen and infected hand that he had not taken his painkillers or antibiotics for;
- his depression and anxiety;
- his failure to take his prescribed medication for his depression and anxiety;
- his lack of sleep in 40 hours; and
- his emotional breakdowns throughout the day.

Additionally, Dobbs notes that he had minimal contact with law enforcement prior to the day of the accident as he had no prior adult or juvenile record and had never been on probation or supervision.

¶74 However, Dobbs's failure to establish any improper police practices is determinative. We decline Dobbs's invitation to assess the voluntariness of his statements based solely on the his physical and mental condition as it would "effectively result in the establishment of a per se rule of involuntariness (and inadmissibility) whenever an officer

43

questions a defendant who is suffering from serious pain and undergoing medical treatment at the time the questioning takes place." Clappes, 136 Wis. 2d at 242. We conclude that based upon the lack of proof of any improper police practices, Dobbs's statements were voluntary.

## IV. CONCLUSION

¶75 We conclude that the circuit court properly exercised its discretion when it excluded Dr. White's exposition testimony for a lack of fit with the facts of Dobbs's case. Additionally, although we determine that several of Dobbs's statements should have been suppressed because he was subject to custodial interrogation and not read the Miranda warnings, we conclude that the error was harmless. We further conclude that all of Dobbs's statements were voluntary.

¶76 *By the Court.*—The decision of the court of appeals is affirmed.

44

¶77 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I join the majority opinion's analyses and conclusions regarding the admissibility of Dr. White's expert testimony and the voluntariness of Dobbs' statements to law enforcement. But I do not join the majority's analysis or conclusions regarding Miranda[1] and custodial interrogation for two reasons. First, I disagree with the majority's ultimate conclusion. Dobbs was not subject to custodial interrogation at any time prior to receiving his Miranda warnings on the day in question. Second, I am concerned that the majority's analysis, though it addresses the Fifth Amendment and Miranda, could seriously undermine Fourth Amendment law regarding Terry[2] stops and investigatory detention. Accordingly, I write separately to clarify the jurisprudence surrounding the intersection of Terry investigatory detention and Miranda custodial interrogation. I respectfully concur.

## I. MIRANDA AND THIS CASE

¶78 The Fifth Amendment to the United States Constitution states that "[n]o person" "shall be compelled in any criminal case to be a witness against himself" or herself. Article 1, section 8(1) of the Wisconsin Constitution affords the same protection. State v. Bartelt, 2018 WI 16, ¶26, 379 Wis. 2d 588, 906 N.W.2d 684 (citing State v. Ward, 2009 WI 60, ¶18 n.3, 318 Wis. 2d 301, 767 N.W.2d 236). In Miranda v. Arizona, the

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] Terry v. Ohio, 392 U.S. 1 (1968).

1

Supreme Court concluded that the Fifth Amendment requires law enforcement to inform suspects of their rights prior to conducting custodial interrogations.[3] 384 U.S. 436 (1966). Miranda warnings are required because "'[t]he circumstances surrounding in-custody interrogation can operate very quickly to overbear the will of [the suspect.]'" Bartelt, 379 Wis. 2d 588, ¶27 (quoting Miranda, 384 U.S. at 469). Accordingly, Miranda is rooted in a concern that custodial interrogation can "compel[]" a suspect "to be a witness against himself" or herself. U.S. Const. amend. V.

¶79 In this case, law enforcement did not inform Dobbs of his Miranda rights until around 10:19 a.m., after he had already made a series of statements. This concurrence focuses on the narrow issue of whether Miranda required Dobbs' pre-warning

---

[3] We summarized the content of Miranda warnings and suspects' relevant rights in Bartelt as follows:

> "[The suspect] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Miranda, 384 U.S. at 479. If the accused indicates that he or she wishes to remain silent, questioning must stop. If he or she requests counsel, questioning must stop until an attorney is present. Id. at 474.

State v. Bartelt, 2018 WI 16, ¶27 n.6, 379 Wis. 2d 588, 906 N.W.2d 684.

2

statements to be suppressed.[4] Because only custodial interrogation triggers Miranda protections, the court must determine whether Dobbs was both in custody and subject to interrogation prior to 10:19 a.m. On review, determinations of custody and interrogation involve a two-step process. Bartelt, 379 Wis. 2d 588, ¶25; State v. Harris, 2017 WI 31, ¶9, 374 Wis. 2d 271, 892 N.W.2d 663. We review the circuit court's factual findings and uphold them unless they are clearly erroneous. Bartelt, 379 Wis. 2d 588, ¶25; Harris, 374 Wis. 2d 271, ¶9. We then apply constitutional principles regarding Miranda custody and interrogation to the facts de novo, but benefit from the analyses of the courts below. Bartelt, 379 Wis. 2d 588, ¶25; Harris, 374 Wis. 2d 271, ¶9. The parties do not dispute the circuit court's factual findings in this case.

A. Custody

¶80 "The test to determine whether a person is in custody under Miranda is an objective test." Bartelt, 379 Wis. 2d 588, ¶31 (citing State v. Lonkoski, 2013 WI 30, ¶27, 346 Wis. 2d 523, 828 N.W.2d 552). We look to the "totality of the circumstances" to determine "whether there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest." Id. (citing Lonkoski, 346 Wis. 2d 523, ¶27; California

---

[4] Dobbs does not challenge the sufficiency of law enforcement's Miranda warnings, once he heard them, or the validity of his waiver. Rather, he challenges the admissibility of his post-Miranda warning statements as involuntary only. I join the majority on the voluntariness issue, and so will not address it here.

3

v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam); and State v. Martin, 2012 WI 96, ¶33, 343 Wis. 2d 278, 816 N.W.2d 270)). See also New York v. Quarles, 467 U.S. 649, 655 (1984) ("'[T]he ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest[.]'" (quoting Beheler, 463 U.S. at 1125)).

¶81 "We consider a variety of factors to determine whether under the totality of the circumstances a reasonable person would feel at liberty to [leave]." Bartelt, 379 Wis. 2d 588, ¶32. Those factors include: "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint." Martin, 343 Wis. 2d 278, ¶35 (citing State v. Morgan, 2002 WI App 124, ¶12, 254 Wis. 2d 602, 648 N.W.2d 23). Regarding degree of restraint, "we consider: whether the suspect is handcuffed, whether a weapon is drawn, whether a frisk is performed, the manner in which the suspect is restrained, whether the suspect is moved to another location, whether questioning took place in a police vehicle, and the number of officers involved." Bartelt, 379 Wis. 2d 588, ¶32 (citing Morgan, 254 Wis. 2d 602, ¶12).

¶82 But the restraint-on-freedom-of-movement test does not end the inquiry. Bartelt, 379 Wis. 2d 588, ¶33. Restraint on freedom of movement, i.e., constructive arrest, is a necessary, but not a sufficient condition to establish Miranda custody. Id. "If we determine that a suspect's freedom of movement" is restrained to a degree "such that a reasonable person would not feel free to leave, we must then consider whether 'the relevant

4

environment presents . . . inherently coercive pressures . . . .'" Id. (quoting Howes v. Fields, 565 U.S. 499, 509 (2012)). Only then will Miranda's Fifth Amendment concerns regarding compelled witness testimony be triggered. A person may not always be free to leave circumstances such as those present here, but that does not require a determination that such person is in custody.

¶83 In this case, Dobbs was not in custody prior to receiving the Miranda warnings. The circuit court determined that Dobbs was not subject to custodial interrogation until after 10:19 a.m. Similarly, the court of appeals concluded that Dobbs was detained, but not in custody. State v. Dobbs, No. 2018AP319-CR, unpublished slip op., ¶¶11-14 (Wis. Ct. App. May 2, 2019). I agree. Under the totality of the circumstances, Dobbs was not formally arrested or subject to a restraint on freedom of movement to a degree associated with formal arrest prior to receiving the Miranda warnings. Bartelt, 379 Wis. 2d 588, ¶31. The majority concludes otherwise only because it seemingly changes the Bartelt test for Miranda custody.[5] It gives too much weight to particular factors at the expense of the totality of the circumstances, and ignores the final inquiry whether the environment included inherently coercive pressures.

---

[5] The majority also relies on the State's concession in this case that Dobbs was subject to custodial interrogation. See majority op., ¶55. But we are not bound by the State's concession. State v. Anderson, 2014 WI 93, ¶19, 357 Wis. 2d 337, 851 N.W.2d 760 ("[W]e are not bound by a party's concession of law." (citing Bergmann v. McCaughtry, 211 Wis. 2d 1, 7, 564 N.W.2d 712 (1997))).

5

¶84 Regarding Dobbs' "freedom to leave," Martin, 343 Wis. 2d 278, ¶35, the majority notes that Officer Milton blocked Dobbs' vehicle, handcuffed him, and put him in the squad car. Majority op., ¶61. The majority also notes that, while at the hospital, Dobbs was guarded. Id. But during any traffic stop, the suspect is not permitted to drive away, whether the vehicle is blocked or not. Additionally, it is not unusual for law enforcement to place a suspect in a squad car while they investigate and control the scene or to guard a suspect. The majority determines that Dobbs was not free to leave under these circumstances. Id. That may be true. But even if a suspect is not free to leave, that does not establish that he is in custody. Not being free to leave, though a necessary condition to conclude a suspect is in custody, is not itself sufficient to conclude a suspect is in custody. See Quarles, 467 U.S. at 655 (describing the ultimate inquiry as "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"). If it was sufficient, then any person temporarily detained for an ordinary traffic stop would be in custody. While perhaps not actually "free to leave," these people are not in Miranda custody. See Berkemer v. McCarty, 468 U.S. 420, 436 (1984) ("Certainly few motorists would feel free . . . to leave the scene of a traffic stop without being told they might do so."). The record reflects that Dobbs' case unfolded in a manner similar to an investigation and detention incident to a traffic stop. Indeed, Officer Milton repeatedly told Dobbs that there was an ongoing

6

investigation. See majority op., ¶8. Dobbs may not have been actually "free to leave," but that does not mean that he was in custody.

¶85 Regarding the second factor, "the purpose, place, and length of the interrogation," Martin, 343 Wis. 2d 278, ¶35, the majority's analysis again distorts facts ordinarily associated with a routine traffic stop into Miranda concerns. The majority does not analyze the purpose of Officer Milton's questioning at all, but notes that it occurred intermittently over the course of three hours in the squad car and at the hospital. Majority op., ¶¶62-63. There are several problems with this. First, general on-the-scene questioning is not the same thing as interrogation and does not raise Miranda concerns to the same degree. Dobbs was not subjected to questioning of any significant length and the type of conversation that occurred did not amount to interrogation. Second, the place of Dobbs' questioning was not of particular concern. Questioning suspects in squad cars and hospitals, particularly incident to suspected OWI or traffic accident cases, is a common, and often necessary, law enforcement practice in order to control a scene or ensure the health and well-being of a suspect. Regarding the purpose of law enforcement's questions, Dobbs was asked who he was, where he was coming from, where he was going, how he got his injuries, and whether he had any other medical issues or took any medications. Majority op., ¶7. These types of questions are routine in traffic stops, traffic accidents, and suspected OWI cases.

7

¶86 Regarding "the degree of restraint," Martin, 343 Wis. 2d 278, ¶35, the majority notes that Officer Milton held his service weapon, that there were other officers on the scene and at the hospital, and that Dobbs was frisked, handcuffed, and locked in the squad car. Majority op., ¶64. But again, during a routine traffic stop, a frisk or the presence of multiple officers is common in order to ensure officer safety. Importantly, there is nothing in the record to suggest that Officer Milton, though he had his hand on his service weapon, ever pointed it at Dobbs. Simply holding a service weapon, without pointing it at a suspect, is also appropriately related to officer safety. Nor does the fact that Dobbs was handcuffed pull the degree of restraint in this case into Miranda custody. Martin, 343 Wis. 2d 278, ¶34 ("We recognize that the use of handcuffs does not in all cases render a suspect in custody for Miranda purposes."). Even as a whole, these facts did not necessarily render Dobbs in Miranda custody. Martin, 343 Wis. 2d 278, ¶34 n.23 ("[D]rawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes." (quoting United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995))).

8

¶87 Accordingly, none of the Miranda custody factors favor a determination of custody in this case.[6] Dobbs was not formally arrested or restrained to a degree associated with formal arrest. Because I so conclude, my custody analysis ends here. But, under Bartelt, since the majority concluded that Dobbs was restrained to the degree associated with formal arrest, the majority should have continued on to consider "whether 'the relevant environment present[ed] . . . inherently coercive pressures . . . .'" Bartelt, 379 Wis. 2d 588, ¶33 (quoting Howes, 565 U.S. at 509.) For the sake of completeness, I note that there was nothing inherently coercive or wrongful about law enforcement's conduct in this case. There is nothing in the record to suggest otherwise. Indeed, the majority notes the utter lack of wrongful or coercive conduct in the record in its

---

[6] This case is distinguishable from State v. Morgan, 2002 WI App 124, 254 Wis. 2d 602, 648 N.W.2d 23. In that case, the court of appeals concluded that Morgan was in custody where, after police pointed their guns at Morgan, he tried to flee and was chased and caught by police, was frisked, handcuffed and placed in a squad car. Id., ¶¶3-4, 17. Dobbs never had a weapon pointed at him and never tried to evade or escape law enforcement. Under the totality of the circumstances, it is clear that Dobbs was handcuffed and in the back of the squad car for a very different reason from Morgan, and law enforcement used significantly less force against Dobbs than Morgan.

Rather, this case is more analogous to State v. Gruen, 218 Wis. 2d 581, 582 N.W.2d 728 (Ct. App. 1998). In that case, Gruen was not in custody where, after a traffic accident, he was stopped near the scene, frisked, placed in the back of a police van, and questioned by law enforcement. Id. at 586, 597-98. Just like Gruen, Dobbs did not have a weapon pointed at him, but was stopped near the scene of a traffic accident, frisked, detained in a police vehicle, and questioned. If Gruen was not in custody, then Dobbs was not either.

9

voluntariness analysis. Majority op., ¶¶73-74. Consideration of the relevant environment further counsels against a determination of Miranda custody in this case.

## B. Interrogation

¶88 For purposes of Miranda, interrogation includes express questioning or its functional equivalent. Harris, 374 Wis. 2d 271, ¶¶16-17, 19-22. "Express questioning" includes "only those questions 'designed to elicit incriminatory admissions.'" Id., ¶16 (quoting Pennsylvania v. Muniz, 496 U.S. 582, 602 n.14 (1990)). "It is the nature of the information the question is trying to reach, therefore, that determines whether" the question triggers Miranda. Id., ¶17. If the desired "information has no potential to incriminate the suspect, the question requires no Miranda warnings." Id. (citing Doe v. United States, 487 U.S. 201, 211 n.10 (1988) ("In order to be privileged, it is not enough that the compelled communication is sought for its content. The content itself must have testimonial significance.")).

¶89 Miranda can also be triggered by the "'functional equivalent' of an interrogation." Harris, 374 Wis. 2d 271, ¶19 (citing Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980)). Functional equivalence is aimed at capturing law enforcement "techniques of persuasion that, in a custodial setting, can create the same potential for self-incrimination even in the absence of an express question." Id. The functional equivalents of interrogation include "'any words or actions on the part of the police (other than those normally attendant to

10

arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Id. (quoting Innis, 446 U.S. at 301 (footnotes omitted)). Functional equivalence is an objective inquiry; neither law enforcement's underlying subjective intent nor the suspect's subjective understanding is dispositive. Id., ¶¶20, 22.

¶90 Rather, we review law enforcement's actions from the perspective of a "reasonable third-person observer and inquir[e] into how such a person would expect the suspect to react to the officer's words and actions." Harris, 374 Wis. 2d 271, ¶22. We impute to the third-person observer "'[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion.'" Id., ¶21 (quoting Innis, 446 U.S. at 302 n.8). The test is:

> "[I]f an objective observer (with the same knowledge of the suspect as the police officer) could, on the sole basis of hearing the officer's remarks or observing the officer's conduct, conclude that the officer's conduct or words would be likely to elicit an incriminating response, that is, could reasonably have had the force of a question on the suspect, then the conduct or words would constitute interrogation."

Id., ¶22 (quoting State v. Cunningham, 144 Wis. 2d 272, 278-79, 423 N.W.2d 862 (1988)).

¶91 The majority concludes that Dobbs was subject to interrogation. Majority op., ¶67. But, in so concluding, it relies entirely on the State's ill-advised concession that Officer Milton interrogated Dobbs. Because I conclude Dobbs was not in custody, I need not analyze whether he was interrogated; regardless, the Miranda protections are not triggered. See

11

*Innis*, 446 U.S. at 300-01 ("[T]he *Miranda* safeguards come into play whenever a person <u>in custody</u> is subjected to either express questioning or its functional equivalent." (Emphasis added.)). But I have reason to doubt the merit of the State's concession in this case.

¶92 First, I note——and the majority seems to agree——that at least some of Dobbs' statements were spontaneous and not elicited in any way. <u>See</u> majority op., ¶¶15-16, 49, 69. Second, I am unpersuaded that Officer Milton's questions were express questions designed to elicit incriminating admissions. As discussed above, Officer Milton's questions were routine investigatory questions incident to ordinary traffic stops, traffic accidents, or suspected OWI cases. General, on-the-scene questioning of this sort is not interrogation. <u>See</u> <u>United States v. Adegbite</u>, 846 F.2d 834, 838 (2d Cir. 1988) ("[T]he solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by <u>Miranda</u> . . . ."). Third, I am equally unpersuaded that this case presents any functional equivalent concerns. I do not readily see a basis for a reasonable third-party observer to conclude that any officer's words or conduct "'could reasonably have had the force of a question on'" Dobbs. <u>Harris</u>, 374 Wis. 2d 271, ¶22 (quoting <u>Cunningham</u>, 144 Wis. 2d at 279).

¶93 Thus, I disagree with the majority's ultimate conclusion; Dobbs was not subject to custodial interrogation under <u>Miranda</u>. But my disagreement with the majority does not end there. I am also concerned that its analysis conflates the

12

routine investigatory detention of Dobbs in this case with custody and _Miranda_ Fifth Amendment violations, thereby undermining our Fourth Amendment jurisprudence.

## II.   THE INTERSECTION OF _MIRANDA_ AND _TERRY_.

¶94  The Fourth and Fifth Amendments to the United States Constitution protect different interests.  As discussed above, the Fifth Amendment and _Miranda_ protect the right to be free from compulsion to incriminate oneself.  U.S. Const. amend V.  Relevant here, the test for _Miranda_ custody is whether, under the "totality of the circumstances," viewed objectively, "there is a formal arrest or restraint on freedom of movement of a degree associated with a formal arrest."  _Bartelt_, 379 Wis. 2d 588, ¶31.  Custody is analyzed in light of various factors, including: "the defendant's freedom to leave; the purpose, place, and length of the interrogation; and the degree of restraint."  _Martin_, 343 Wis. 2d 278, ¶35 (citing _Morgan_, 254 Wis. 2d 602, ¶12).

¶95  In contrast, the Fourth Amendment protects the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV.; _see also_ Wis. Const. art. 1, § 11.  If law enforcement conducts a traffic stop or "temporary investigative stop," that is "a seizure within the meaning of the Fourth Amendment . . . ."  _State v. Blatterman_, 2015 WI 46, ¶17, 362 Wis. 2d 138, 864 N.W.2d 26.  To comply with the Fourth Amendment, the stop must be reasonable at its inception and in its duration.  _Id._, ¶¶19-20.  "Pursuant to _Terry v. Ohio_, 392 U.S. 1, a police officer may, under certain circumstances,

13

temporarily detain a person for purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest." Id., ¶18 (citing Terry, 392 U.S. at 22; State v. Chambers, 55 Wis. 2d 289, 294, 198 N.W.2d 377 (1972). "The Wisconsin Legislature codified the Terry constitutional standard in Wis. Stat. § 968.24." Id. Relevant here, "an officer may conduct a temporary investigatory detention when 'the officer reasonably suspects that [a] person is committing . . . a crime.' § 968.24." Id., ¶19. Accordingly, an officer may conduct an investigatory detention so long as he has reasonable suspicion to do so and the detention is reasonable in duration. See id., ¶¶19-20.

¶96 What starts as an investigatory detention can turn into an arrest. If and when it does, the Fourth Amendment requires that the arrest be supported by probable cause. See Blatterman, 362 Wis. 2d 138, ¶29. The test whether a suspect is arrested is "whether a 'reasonable person in the defendant's position would have considered himself or herself to be "in custody," given the degree of restraint under the circumstances.'" Id., ¶30 (quoting State v. Swanson, 164 Wis. 2d 437, 447, 475 N.W.2d 148 (1991), abrogated on other grounds by State v. Sykes, 2005 WI 48, 279 Wis. 2d 742, 695 N.W.2d 277)). The similarities between Fourth Amendment arrest analysis and Fifth Amendment custody analysis are readily apparent. This case tees up questions surrounding the intersection between the Fifth Amendment and Miranda custodial interrogation on one hand, and the Fourth Amendment, Terry

14

investigatory detentions, and arrests on the other. A Terry investigatory detention can turn into an arrest. Miranda custody occurs when a suspect is under arrest or restrained to a degree associated with formal arrest. So can a Terry investigatory detention turn into Miranda custodial interrogation? If so, when and how?

¶97 In Morgan the court of appeals said that Miranda and Terry are two different analyses designed to protect different constitutional rights. Morgan, 254 Wis. 2d 602, ¶¶13-16. Morgan was not the first time that Wisconsin courts noted the intersection of Miranda and Terry. See also, State v. Griffith, 2000 WI 72, ¶69 n.14, 236 Wis. 2d 48, 613 N.W.2d 72; Swanson, 164 Wis. 2d at 447-49; Gruen, 218 Wis. 2d at 593-94; and State v. Pounds, 176 Wis. 2d 315, 322, 500 N.W.2d 373 (Ct. App. 1993). In Griffith, a Fourth Amendment traffic stop case, we stated:

> The United States Supreme Court has held that persons temporarily detained in ordinary traffic stops are not "in custody" and therefore not subject to the rule in [Miranda]. Berkemer v. McCarty, 468 U.S. 436, 440 (1966); see also [Swanson, 164 Wis. 2d at 449]. However, the Court made clear that if a detained motorist is treated in such a manner that he or she is rendered "in custody" for practical purposes, Miranda protections are triggered. Berkemer, 468 U.S. at 440.

Griffith, 236 Wis. 2d 48, ¶69 n.14.

¶98 In this case, the majority appears to draw a bright line between Terry Fourth Amendment jurisprudence and Miranda Fifth Amendment jurisprudence. See majority op., ¶57 ("We uphold Morgan and clarify that the Fourth Amendment and Fifth Amendment protect different interests and involve different inquiries."); see also id., ¶60 ("We therefore recognize the

15

distinction between an analysis of a violation of the Fourth and Fifth Amendment as aptly described in Morgan, 254 Wis. 2d 602, ¶¶13-16."). In doing so, the majority oversimplifies the analysis in this case, ignores an important issue in constitutional law, and potentially undermines Fourth Amendment law as an expense of its development of Fifth Amendment law.

¶99 The extent to which a stop can be reasonable under Terry for Fourth Amendment purposes and, nonetheless, render the suspect in custody under Miranda for Fifth Amendment purposes is an issue subject to a federal circuit court split. The Second, Seventh, Ninth, and Tenth Circuits conclude that the two inquiries are entirely distinct. See United States v. Ali, 68 F.3d 1468, 1473 (2d Cir. 1995) (stating that whether a stop was permissible under Terry is "irrelevant" to Miranda analysis, because "Terry is an exception to the Fourth Amendment probable-cause requirement, not to the Fifth Amendment protections against self-incrimination"); United States v. Smith, 3 F.3d 1088, 1096-97 (7th Cir. 1993) (noting the "'vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment'"; stating that its "inquiry into the circumstances of temporary detention for a Fifth and Sixth Amendment Miranda analysis requires a different focus than that for a Fourth Amendment Terry stop"); United States v. Kim, 292 F.3d 969, 976 (9th Cir. 2002) (stating that "whether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for Miranda

16

purposes are two different issues"); and United States v. Perdue, 8 F.3d 1455, 1463-64 (10th Cir. 1993) (noting that "a suspect can be placed in police 'custody' for purposes of Miranda before he has been 'arrested' in the Fourth Amendment sense"; holding that a gunpoint stop permissible under the Fourth Amendment "created the 'custodial' situation envisioned by Miranda and its progeny").

¶100 The First, Fourth, and Eighth Circuits conclude that the two inquiries are not so distinct. See United States v. Trueber, 238 F.3d 79, 92 (1st Cir. 2001) (stating, "As a general rule, Terry stops do not implicate the requirements of Miranda because Terry stops, though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates Miranda warnings") (internal quotations omitted); United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (discussing Terry law in the course of its Miranda analysis and stating, "From these standards, we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes"); and United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003)(rejecting the defendant's "broad contention that a person is in custody for Miranda purposes whenever a reasonable person would not feel free to leave"); see also id. ("One is not free to leave a Terry stop until the completion of a reasonably brief investigation, which may include limited questioning. But most Terry stops do

17

not trigger the detainee's Miranda rights."). See also Katherine M. Swift, Drawing a Line Between Terry and Miranda: The Degree and Duration of Restraint, 73 U. Chi. L. Rev. 1075, 1084-88 (summarizing this split of authority).

¶101 To the majority, the issue in this case is whether Dobbs was in custody under Miranda. To me, the actual issue in this case is whether law enforcement's investigatory detention of Dobbs under Terry turned into custody under Miranda for Fourth and Fifth Amendment purposes. I answer no, it did not. The totality of the circumstances, viewed objectively, demonstrate that Dobbs was subject to a reasonable investigatory detention, but not in Miranda custody. The intersection of Miranda and Terry is at the heart of this case. But the majority fails to meaningfully address it. I am concerned that the majority's analysis of Fifth Amendment Miranda law could seriously undermine Fourth Amendment Terry law, and so I cannot join it.

### III. CONCLUSION

¶102 I join the majority opinion's analyses and conclusions regarding the admissibility of Dr. White's expert testimony and the voluntariness of Dobbs' statements to law enforcement. But I do not join the majority's analysis or conclusions regarding Miranda and custodial interrogation for two reasons. First, I disagree with the majority's ultimate conclusion. Dobbs was not subject to custodial interrogation at any time prior to receiving his Miranda warnings on the day in question. Second, I am concerned that the majority's analysis, though it addresses

18

the Fifth Amendment and <u>Miranda</u>, could seriously undermine Fourth Amendment law regarding <u>Terry</u> stops and investigatory detention. Accordingly, I write separately to clarify the jurisprudence surrounding the intersection of <u>Terry</u> investigatory detention and <u>Miranda</u> custodial interrogation.

¶103 For the foregoing reasons, I respectfully concur.

¶104 I am authorized to state that Chief Justice PATIENCE DRAKE ROGGENSACK and Justice BRIAN HAGEDORN join this opinion.

19

¶105 DANIEL KELLY, J. *(concurring).* There are many reasons people grow frustrated with the law. It's language is too arcane, it's written at such length that no normal person can reasonably hope to comprehend even a small part of its content, it spreads like a crazed spider web across innumerable sections, subsections, paragraphs, and parts, it changes so frequently it's impossible to stay abreast of it, etc. But for those who actually make an effort to discover what the written law requires, perhaps one of its most maddening features is that, apparently, it sometimes doesn't mean what it so plainly says. Or at least that's sometimes the case once we get our hands on it, as we did today with Wis. Stat. § 907.02(1). No tremors will spread through our republic because of our treatment of this evidentiary rule. But the way we reached our conclusion will alienate the people from their law just a smidgen more, and will further encourage the perception that the law cannot be understood without the priestly class of lawyers and judges revealing their gnosis to those to whom the law actually belongs.[1]

---

[1] The advent of a written code of law is one of the most significant developments in the relationship between governors and the governed. Some of the key attributes of a written code include the following:

> [I]t was important that the laws be stated in the vernacular, not Latin, and be phrased in clear and ordinary language, so that citizens could consult the code and perfectly understand their rights and obligations, without having to go to lawyers and judges. The codes needed to be organized logically so that people could readily find the relevant laws. And the provisions ought to be short, so that people could more easily remember them.

¶106 Today, we made Wis. Stat. § 907.02(1) say something that no reasonably capable English-speaker would understand it to say. Our task was to determine whether the 2011 addition of the Daubert[2] standard for the admission of expert witness testimony changed the standard for the admission of expert witness testimony. Just to state the question suggests the answer. The text of the statute confirms the answer cannot be anything other than "yes." It's not a lengthy provision, so I'll set it out in full with the text added by the 2011 "Daubert" amendment underlined for the sake of clarity:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

2011 Wis. Act 2, § 34m (emphasis added). Most of the preamble in this provision addresses whether expert testimony would be helpful to the jury and whether the proposed witness qualifies as an expert. The part at issue today is the permission granting clause, which provides that an expert witness "may testify thereto [that is, his area of expertise] in the form of an opinion or otherwise, if" the witness satisfies the conditions that follow.

---

Peter Tiersma, The Rule of Text: Is It Possible to Govern Using (Only) Statutes?, 6 NYU J.L. & Liberty 260, 270-71 (2011).

[2] Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

2

¶107 I pause at this spot in the statute because this is where the majority discovers some gnosis not accessible through the words on the page. Ordinary folk like me see the "if" and conclude that what precedes it is contingent on what follows.[3] Thus, I understand this language to mean that the expert may testify "in the form of an opinion or otherwise" but only if he can meet the conditions following the "if."[4] The court, however, acting on a plane of understanding to which I apparently do not have access, says that only testimony in the form of an opinion is subject to the listed conditions. Testimony in the "otherwise" category, for some reason, is not. The court dedicates the bulk of its opinion on this subject to a detailed discussion of testimony in the "otherwise" category——its type,

---

[3] The Oxford English Dictionary defines "if" as "[i]ntroducing a clause of condition or supposition" and as meaning "[o]n condition that; given or granted that; in (the) case that; supposing that; on the supposition that." If, The Oxford English Dictionary (definition A. I. (conjunction)). Merriam-Webster similarly defines "if" as meaning "in the event that," "allowing that," "on the assumption that," and "on condition that." See If, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/if.

[4] We actually have a requirement that we read statutory language the way everyone else does, with a narrow exception for technical meanings and special definitions. "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). We give that language "its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id., ¶45. There are no technical or specially-defined words involved in the statute we are considering today, so we should read it just like everyone else.

3

its value, and our treatment of it prior to the 2011 Daubert amendment. I have no quibble with this historical recitation, but I can't figure out how it separates "opinion" from "otherwise" such that testimony in the former category is subject to the statute's Daubert conditions while testimony in the latter is not. The actual words on the page flat-out contradict the court inasmuch as they do not distinguish between "opinion" testimony and "otherwise" testimony. They say an expert "may testify thereto in the form of an opinion or otherwise, if . . . ." In ordinary English, this means the "if" applies with just as much force to "otherwise" as it does to "opinion."[5]

---

[5] Part of the problem might be the court's apparent understanding that an expert who applies his principles and methods to the facts of a case must necessarily be offering an opinion. It says "[e]ven if Dr. White had simply been asked whether any of the factors he described in his exposition testimony related to Dobbs's case, his response would be offering his view about whether his exposition testimony relates to the particular facts in Dobbs's case." Majority op., ¶36 n.18. The court does not explain why this is the only way Dr. White could have been asked to connect his principles and methods to the facts of this case, nor does it provide any authority for the proposition.

¶108 Although I'm highlighting the court's gnostic understanding of Wis. Stat. § 907.02(1), the majority isn't exactly hiding it, as a comparison between its framing of the question and its answer makes plain. The majority says, and I agree, that the issue before us is "[w]hether the Daubert reliability standard . . . altered Wisconsin's long-standing practice of allowing expert exposition testimony . . . ." Majority op., ¶35. Before I get to the court's answer, a short glossary: In this framing, "Daubert reliability standard" means the requirements following the "if" in § 907.02(1), including the requirement that the witness "applied the principles and methods reliably to the facts of the case"; and the term "exposition testimony" means testimony included in the "otherwise" category. And now the court's answer: "[W]e conclude that Wis. Stat. § 907.02(1) continues to permit an expert witness to testify in the form of an opinion 'or

---

It's not hard to imagine exposition testimony that the expert ties to the facts of the case without expressing an opinion. Here, after providing his exposition about false confessions, Dr. White could have been asked whether he examined Mr. Dobbs, and what the observation or examination comprised. And he could have been asked whether, pursuant to this examination, he observed any of the factors he described in his exposition as potentially disposing a person to confess falsely. So long as Dr. White does not take the ultimate step of saying whether he believed the presence of those pre-disposing factors meant that Mr. Dobbs had confessed falsely, he would not have rendered an opinion. But he would have applied his principles and methods to the facts of the case. In fact, this is exactly the type of connection the court describes as "fitness."

So it simply is not true that all expert testimony that the witness ties to the facts of the case is necessarily opinion testimony.

5

otherwise,' including exposition testimony on general principles without explicitly applying those principles to, or even having knowledge of, the specific facts of the case." Majority op., ¶42. So, although the words on the page say the legislature made the admission of "otherwise" testimony contingent on the expert having "applied the principles and methods reliably to the facts of the case," we know——with our special knowing——that this actually means the opposite, that the expert does <u>not</u> need to have "applied the principles and methods reliably to the facts of the case." And so today we reveal to the bench, bar, and public that our special insight allowed us to see that the <u>Daubert</u> reliability standard of § 907.02(1) applies to only one of the listed categories, even though the actual text says it applies to both.[6]

¶109 But that does not end our revelation. Having discerned that the existing words do not mean what they so obviously say, we further discerned that Wis. Stat. § 907.02(1) contains a condition that is not actually there. The court says that

> [w]hen expert testimony is proffered in the form of an exposition on general principles, the circuit court,

---

[6] The majority cites other courts that have experienced similar insight, as well as the Advisory Committee Notes to Federal Rule of Evidence 702 (the federal analog to our expert witness rule). The court's apparent goal is to create a sense of authority out of nothing more than a multiplicity of sources because none of the citations lend any additional explanatory power to the court's gnostic insights. If other sources explain <u>why</u> certain language doesn't actually mean what it appears to say, I will be an attentive student. But a sea of others simply ignoring the text of the law means nothing to me.

as gatekeeper, must consider the following four factors: (1) whether the expert is qualified;[7] (2) whether the testimony will address a subject matter on which the factfinder can be assisted by an expert;[8] (3) whether the testimony is reliable;[9] and (4) whether the testimony will "fit" the facts of the case.[10]

Majority op., ¶43. From the footnotes I attached to each of the elements in this quote, it is easy to see that one of them is not like the others. Elements one through three each reiterates a requirement contained in § 907.02(1). Element four, however, has no counterpart in the statute and is instead a purely judicial creation.

¶110 That we would add a condition not already present in the statute is interesting enough. But what I find fascinating is why the court grafted the condition onto the statute. "Establishing the fit of exposition testimony is particularly important," the court says, "because, unlike opinion testimony, exposition testimony does not in and of itself explicitly connect the witness's expertise to the particular facts of the

---

[7] This element echoes the statute's requirement that the witness is "qualified as an expert by knowledge, skill, experience, training, or education[.]" Wis. Stat. § 907.02(1).

[8] This is a restatement of the statutory requirement that expert testimony is admissible only "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" Wis. Stat. § 907.02(1).

[9] This reflects one of the Daubert reliability standards, that is, that "the testimony is the product of reliable principles and methods." Wis. Stat. § 907.02(1).

[10] This element has no counterpart in Wis. Stat. § 907.02(1).

7

case." Majority op., ¶44. Well, yes. But the explicit connection is absent only because our gnosis revealed that the statutory requirement that "the witness has applied the principles and methods reliably to the facts of the case" does not apply to exposition testimony, even though the text obviously says it does. So now we are trying to patch a hole of our own making.

¶111 It gets better. The "fitness" patch the court engineered to cover the hole it created is uncannily similar to the condition it excised.

> Whether expert testimony "fits" a case turns on whether it is "sufficiently tied to the facts of the case" such that "it will aid the jury in resolving a factual dispute." Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (1985)). "[E]xpert testimony is helpful to the jury," or fits, "if it concerns a matter beyond the understanding of the average person, assists the jury in understanding facts at issue, or puts the facts in context."

Majority op., ¶44 (emphasis added). There's a reason for the similarity, and the court's Daubert cite should have tipped it off to the irony of what it is doing here. The Daubert quote on which the majority relies for its "fitness" requirement is itself the inspiration for the Wis. Stat. § 907.02(1) requirement that the witness apply his testimony to the facts of the case. So let's take stock of where we are. Our legislature wrote into § 907.02(1) the Daubert requirement that the expert connect his testimony to the facts of the case, we took that condition out and replaced it with a patch based on Daubert's "fitness" concept, the very concept that inspired the condition we removed, the removal of which created the need for the patch.

8

This is dizzying and disorienting even for those trained in the law. For everyone else, it just makes the law a hopeless jumble.

¶112 One would hope that the end product of the court's superior insight into the true meaning behind the words of Wis. Stat. § 907.02(1) would yield something profound. But it didn't. In fact, it produced just a few minor alterations to the condition it removed. Whereas the statute requires that the witness apply his testimony to the facts so that there is an actual testimonial connection between the two, the court's "fitness" requirement downgrades the connection from explicit to implicit, and requires that the court make the connection as part of its gate-keeping function rather than requiring the witness to make it as part of his testimony. I don't think that cake is worth the candle. And it's most definitely not worth the statute-rending process necessary to get there.

¶113 Having said all this, I agree with the court's conclusion that the circuit court did not err in not admitting Dr. White's testimony. As everyone agrees, he not only did not apply his testimony to the facts of this case, he did not even know what they were. Consequently, he did not satisfy the Wis. Stat. § 907.02(1) condition that the witness must "appl[y] the principles and methods reliably to the facts of the case." Therefore, I join the court's opinion except with respect to Part III.A.

¶114 I am authorized to state that Justice REBECCA GRASSL BRADLEY joins this concurrence.

1