# COURT OF APPEALS
## DECISION
## DATED AND FILED

## April 25, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP1923-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2020CF713

IN COURT OF APPEALS
DISTRICT IV

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

DONALD P. HOUSE,

    DEFENDANT-APPELLANT.

        APPEAL from a judgment of the circuit court for Wood County: GREGORY J. POTTER, Judge. *Affirmed*.

        Before Kloppenburg, P.J., Blanchard, and Nashold, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Donald House appeals a judgment of conviction for operating with a prohibited blood alcohol concentration as a fifth or sixth offense. The issues are whether the circuit court, in denying his suppression motion, correctly determined that House was not in custody for Fifth Amendment purposes before he was arrested, and that House voluntarily consented to a warrantless blood draw. We affirm.

¶2 House pled no contest to one count of operating with a prohibited blood alcohol concentration as a fifth or sixth offense. Before doing so, he moved to suppress statements that he made before arrest and to suppress the blood test result. The circuit court denied the motions. The issues are preserved for appeal, despite House's plea, by operation of WIS. STAT. § 971.31(10) (2021-22).[1]

¶3 House argues that statements he made before his arrest should be suppressed because they were made in response to a custodial interrogation that occurred without him being advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶4 The relevant facts found by the circuit court are not in dispute. Briefly stated, an officer saw House driving a car in a public parking lot after hours, moving towards the exit. The officer asked House to stop, and they had a conversation. The officer observed beer cans in the car and asked a series of questions related to whether House had been drinking. As part of that conversation, House acknowledged that he had been drinking (specifically, that he had consumed three beers at a bar), that he had just been released from prison for

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

drinking and driving, and that he was on "probation or parole." This was followed by field sobriety testing and a preliminary breath test, which led to House's arrest.

¶5    Once the historical facts are found, the determination of when custody began is an issue of law that we review independently of the circuit court. *State v. Bartelt*, 2018 WI 16, ¶25, 379 Wis. 2d 588, 906 N.W.2d 684. We apply a two-part objective test in which we first ask whether the person's freedom of movement was curtailed such that a reasonable person would not feel free to leave, and then ask whether, under the totality of the circumstances, the environment presented the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*. *Bartelt*, 379 Wis. 2d 588, ¶¶31-33.

¶6    House argues that, for *Miranda* purposes, he was in custody before his arrest. He does not argue that he was immediately in custody upon stopping the car at the officer's request. Such an argument, if successful, would turn every traffic stop into a custodial interrogation from the first word, which is clearly not the state of the law. Instead, House argues that custody began at some point during his conversation with the officer. More specifically, he argues that it began when the officer made a statement indicating a belief that House had been drinking and driving, or that it began later, when the officer directed House to place the car in park and not drive. House argues that these were moments that would lead a reasonable person to believe the person was not free to leave.

¶7    The State appears to concede that a reasonable person would not feel free to leave at these moments. However, this factor does not turn every traffic stop into a custodial interrogation. Instead, the State focuses on the second part of the test, whether the environment presented the same coercive pressures as station

house questioning. The State argues that such pressures were not present here. We agree.

¶8 Case law states that a traffic stop typically does not rise to the level of being in custody for *Miranda* purposes unless, under the totality of the circumstances, the person's freedom of action is curtailed to a degree associated with a formal arrest. *State v. Dobbs*, 2020 WI 64, ¶59, 392 Wis. 2d 505, 945 N.W.2d 609. House argues that such curtailment of freedom occurred here because two officers were present, police were asking about his consumption of alcohol, and he was told to stop driving. However, we do not agree that these circumstances are comparable to a formal arrest. These are ordinary circumstances of a traffic stop. Both when House was asked about his consumption of alcohol and also when he was told to stop driving, House was not removed from his vehicle, was not handcuffed or patted down, and he continued to remain in a location that was public. House was not in custody when he made statements to the police before his arrest.

¶9 Turning to the voluntary consent argument, House contends that the circuit court erred by concluding that he voluntarily consented to a warrantless blood draw. After the officer arrested House, the officer read him the informing the accused form and House ultimately agreed to submit to a blood draw. The officer took House to a hospital for the blood draw to be conducted.

¶10 House argues that his consent was not freely and voluntarily given because the officer told him that a blood sample "was required" and the phlebotomist told him that he did not get "the chance to refuse anything." House argues that these statements misinformed him as to whether he was permitted to refuse a warrantless blood draw, and that case law establishes that consent based

on misinformation is not valid. *See State v. Blackman*, 2017 WI 77, ¶¶57-59, 377 Wis. 2d 339, 898 N.W.2d 774.

¶11     These statements by the officer and phlebotomist, if standing alone, might reasonably be interpreted in the manner that House argues. However, there was other context to the exchanges that clarified the situation such that House was not misinformed.

¶12     The context for the officer's statement is as follows. After the officer arrested House, the officer read him the informing the accused form, including the question asking whether House would submit to a blood draw. House asked why that was needed, since the officer already had the results of the "breathalyzer" test. The officer reread the question on the form, and House again asked why. The officer answered, "Because that's what's required," and House responded, "Fine, whatever." The officer asked, "Yes? No?" House answered, "Yes."

¶13     The context for the phlebotomist's statement is as follows. At the hospital, as the blood draw was being readied, House began to insist on giving only one vial of blood. When the phlebotomist said he was going to use two vials, House said that "I'll refuse completely." The phlebotomist said, "You don't get the chance to refuse anything." The officer said, "Okay, so if you refuse completely, I will get a search warrant." After some continued discussion about the search warrant, House repeated, "[O]ne tube. One tube only." The officer asked, "Are you refusing?" House said, "You're only going to take one tube out of my arm." The officer again asked, "Okay, so are you refusing the blood test now?" House first answered by saying, "You don't need two tubes," and then, after some more back and forth along the same lines, said, "You're going to take

two tubes." The officer said, "So are you going to take the blood test or not now?" and House indicated his consent by rolling up his sleeve.

¶14     In both instances, the officer's continued questions asking if House was agreeing or refusing to submit to a blood draw after the statements relied on by House strongly imply that House had a choice to refuse the blood draw, at least as of those moments. In addition, as noted, after the phlebotomist's statement, the officer also told House that if he refused the blood draw, the officer would obtain a search warrant. That statement implies that any refusal would be honored, as of that moment, and would lead to a different course of action by the officer to obtain the sample. These parts of both exchanges sufficed to clarify to House that he was permitted to refuse a warrantless blood draw.

¶15     House also argues that his consent was coerced because the officer did not accept House's repeated refusals, and instead continued to ask if House would allow the blood draw. House does not argue that the officer's demeanor was in any way coercive, but only that his repeatedly asking House whether he agreed or refused to submit to a blood draw was coercive. Although neither party has provided case law exploring the issue, we assume without deciding that, depending on all relevant circumstances, if an officer were to repeatedly ask a person for a blood draw, despite the person's unambiguous refusals, a sufficient number and type of requests could become, or contribute to, coercive conduct in a legal sense. However, under the circumstances here, we conclude that the exchanges during which the officer made multiple requests were not coercive.

¶16     In the first exchange described above, the officer's repeating the question on the informing the accused form when House questioned the need for a blood draw made it clear that House could refuse. In the second exchange

described above, House's demand for only one vial was peculiar and ambiguous, and unlike the easily anticipated form of refusal—with which many police officers would be familiar through experience or training—in which the person entirely rejects a needle insertion and blood draw. Faced with House's demand, it was important, and in House's interest as well, for the officer to proceed as he did: (1) clarify to House that failure to allow two vials would be considered a complete refusal, (2) try to confirm that House understood this point; and (3) pose the question again about whether House would allow two vials. Here, we could not fault the officer as acting prematurely if, at some point during the exchange, the officer had told House that the officer was accepting the refusal and would obtain a search warrant instead. Instead, the officer pursued clarity by engaging in what the video shows was a reasonable back-and-forth exchange, and not an overbearing or misleading series of requests by the officer. As to both exchanges, immediately after House was arrested and then at the hospital, the few extra seconds in which the officer continued to respond to House's statements and provide information, and to wait for House to process the information and reach a decision, was not so long a time as to become coercive.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.